BENNETT, Circuit Judge.
 

 This is an appeal from a judgment of the United States Claims Court.
 
 *
 
 In the proceeding below, the Brunswick Bank & Trust Company (the bank) sued for reimbursement under the terms of a guaranty given by the Farmers Home Administration (FmHA) in support of a loan made by the bank to Springboro Associated Industries, Inc. (Springboro or the borrower). Under the terms of the guaranty, the FmHA promised to reimburse the bank for 90 percent of any loss it suffered on the loan
 
 *1357
 
 because of the borrower’s default. The United States, however, denied liability under its guaranty, contending, in part, that the bank’s fraud and misrepresentations in procuring the guaranty rendered the guaranty void, and that the bank’s negligence in servicing the loan prevented recovery on the guaranty. In addition to these defenses, the United States, in a counterclaim, contended that the bank was liable under the False Claims Act, 31 U.S.C. §§ 231-233, 235 (1976), for making certain misrepresentations that induced the FmHA to issue its guaranty. The bank, in reply, contended that the government’s refusal to accept a settlement offer from one of the loan’s personal guarantors estopped the government from challenging its claim to that extent.
 

 The trial judge, when considering the negligent servicing issue, focused on the bank’s servicing efforts after default, i.e., its liquidation efforts. He held that the bank had the burden of proof on this issue, and had failed to show that its liquidation efforts were reasonable; therefore, the bank was not entitled to recover on the guaranty. The trial judge thus found it unnecessary to consider whether the bank had committed a fraud or misrepresentation that would render the guaranty void. The trial judge also held that the government’s rejection of the settlement offer was reasonable and thus the government was not estopped from challenging the bank’s claim to the extent of the offer. In addition, the trial judge held that the government, on its counterclaim, was entitled to a statutory forfeiture of $2,000 under the False Claims Act because the bank negligently made a material misrepresentation that induced the FmHA to issue its guaranty.
 

 For the reasons that follow, we
 
 affirm in part
 
 and
 
 reverse in part.
 

 I.
 
 Background.
 

 Springboro Associated Industries, Inc., was incorporated on July 16, 1974, by Dr. David S. Olin, a Rahway, New Jersey, dentist, and his business colleague, Mr. Louis LaPree. At some time after the company’s founding, a Mr. Howard Coss acquired a minority interest in Springboro. Olin and LaPree had acquired the Springboro realty and plant facilities (which were located in Springboro, Pennsylvania) following the financial collapse of Albro Packing Company, a processor of bulk sauerkraut. It was Dr. Olin’s intention not only to maintain the processing capabilities of the facility, but also to expand Springboro’s operations by adding a sauerkraut canning operation. Because start-up capital was needed, Dr. Olin began the search for a willing lender. In April 1975, the Brunswick Bank & Trust Co. indicated that it would advance the necessary funds to Springboro if the FmHA would guarantee the loan under its Business and Industrial Loan Program.
 
 [1]
 

 Consequently, on May 23, 1975, the bank filed an application with the FmHA state office in Harrisburg, Pennsylvania, requesting that the FmHA guarantee a proposed bank loan of $485,000 to Springboro. The application stated that the loan would be guaranteed by Dr. Olin, Mr. LaPree, and ZMR Corp. (a company owned by Olin and LaPree). A financial statement of Spring-boro was also forwarded which represented the company’s net worth at $763,670. Although the loan guaranty application received a favorable recommendation at the state level, the national office of the FmHA in Washington, D.C., advised its state director against proceeding with the loan guaranty. One reason given was that the collateral for the loan was not sufficient to protect the interest of the lender and the government. Following this adverse recommendation, Dr. Olin pursued an informal appeal. The national office, however, again advised against issuing the loan guaranty, stating, as before, that the collateral offered in support of the loan was inadequate.
 

 
 *1358
 
 After this rejection, Dr. Olin secured the personal guaranties of Mr. and Mrs. Howard Coss, whose financial statements revealed a net worth of $1.2 million. The addition of this guaranty seems to have finally prompted the national office to authorize execution of the loan guaranty on October 28, 1975. As a result, the state office on November 4 or 5, 1975, issued to the bank a “Conditional Commitment for Guarantee.”
 
 [2]
 
 The bank accepted the conditional commitment on November 12,1975, and closed the loan on the same day.
 

 On November 14,1975, the bank wrote to the FmHA advising them of the loan closing and requesting that the FmHA issue the “Contract of Guarantee.” The bank also submitted accompanying documentation in which the bank set forth certain certifications respecting fulfillment of the requested guaranty’s conditions. The certifications that were made were those required by 7 C.F.R. § 1841.26(a) (1974).
 
 [3]
 
 In addition, the bank submitted a “Certificate of Acquisition or Construction.” The purpose of this certificate was to show what acquisition, construction, major repairs, and major land development had been completed with the loan funds since the loan closing. The bank, however, used this form to show how the loan funds had been disbursed. The bank thus indicated that $117,025.49 was disbursed to pay off the existing obligations of LaPree, Springboro, and ZMR,
 
 [4]
 
 that $185,000 was disbursed for plant modernization and the acquisition and repair of machinery, and that $182,974.60 was disbursed for working capital purposes. The intended construction and acquisition, however, had not actually been completed. Instead, on the date of the loan closing, the bank had merely deposited the $185,000 intended for construction and acquisition in Springboro’s account at the bank along with the $182,974.60 intended for working capital purposes. The bank had subtracted $117,025.49 from the loan proceeds to pay off the existing obligations mentioned above. The total deposited was therefore only $367,974.60.
 

 On January 21, 1976, the bank executed the FmHA’s “Lender’s Agreement,” a doeu
 
 *1359
 
 ment which enumerated the various rights and obligations of the bank and the FmHA. Section II of the Lender’s Agreement provided that the loan note guaranty would be (1) “incontestable except for fraud or misrepresentation of which the Lender has actual knowledge ... ”; and (2) “unenforceable by the Lender to the extent of any loss occasioned by violation of usury laws, use of loan funds for unauthorized purposes, negligent servicing, or failure to obtain the required security .... ” One week later, on January 28, 1976, the FmHA issued the “Contract of Guarantee.”
 

 On February 1,1976, Springboro was unable to pay its first principal payment on the loan ($20,000), and of the $367,974.60 in loan proceeds that had been placed on deposit in Springboro’s account at the bank, only $1,028.69 remained. Springboro could not meet its first loan payment resulting, in part, to the difficulties it was experiencing in its operations. For example, the roof sheltering the storage vats. had collapsed during a December storm; the canning operation was yielding an inferior product which was ultimately condemned by the state; and Springboro was engaged in a contract dispute with the alleged buyer-in-default of the prior season’s bulk sauerkraut. Although it was aware of these problems, the bank agreed to a modification of the loan repayment schedule. All loan payments were postponed until November 12, 1976, when a single payment of $100,-000, plus interest, was due. The scheduled payments after this date remained unaffected. The FmHA also agreed to this change, but it does not appear that FmHA was advised of Springboro’s problems.
 

 By November 1976, when the lump-sum loan payment was due, it was obvious that Springboro could not survive. The bank declared the loan in default and began the process of debt liquidation. The bank focused its initial liquidation efforts on (1) the Springboro plant and its inventory, (2) an insurance claim on the storm-damaged roof, and (3) a lawsuit against the alleged buyer-in-default of the prior season’s bulk sauerkraut. Later, on June 28, 1977, the bank filed suit against some of the individual guarantors — Dr. Olin,
 
 [5]
 
 Mr. and Mrs. Howard Coss, and Mr. Louis LaPree. Although the bank kept Mr.' Scotnicki, an FmHA official, advised of its liquidation activities, it did not submit a comprehensive liquidation plan to the FmHA as required by the regulations.
 
 See
 
 7 C.F.R. § 1841.66.
 

 From its liquidation efforts, the bank was able to recover only a token amount (approximately $10,000). Only the bank’s suit against the Cosses seemed to offer even a glimmer for recovery. At one point, the Cosses’ attorney indicated that the Cosses
 
 might
 
 be willing to pay 50 percent of the debt remaining on the loan after all other collection efforts had been exhausted, if the bank would terminate its action against the Cosses. The FmHA, however, rejected this “offer,” and the bank then proceeded with its litigation. The bank was successful in obtaining a judgment against the Cosses in the Superior Court of New Jersey, but the New Jersey appeals court later reversed this decision and ordered a new trial on several contested issues of fact. The bank took no further action against the Cosses who later filed voluntary petitions in bankruptcy.
 

 As its liquidation efforts were unsuccessful, the bank, on March 13, 1980, filed a claim with the FmHA for reimbursement under the guaranty. The FmHA denied the bank’s claim.
 
 [6]
 
 Therefore, on April 21, 1980, the bank timely filed an action in the former Court of Claims,
 
 [7]
 
 seeking recovery
 
 *1360
 
 on the guaranty. The United States then timely filed a counterclaim for a civil penalty under the False Claims Act, 31 U.S.C. §§ 231-233, 235 (1976).
 

 In his decision, the trial judge held (1) that because the bank had failed to submit a formal liquidation plan to the FmHA for approval, it had the “burden of showing that ... [its] liquidation efforts were nevertheless reasonable and occasioned no less than a contractually responsive liquidation plan might have avoided”; (2) that the bank had failed to meet its burden of showing the reasonableness of its liquidation efforts and had thus “failed to demonstrate entitlement to a recovery on its guaranty”; (3) that “the court cannot say that FmHA was out-of-step in rejecting the [Cosses’] settlement offer”; and (4) that the government was entitled to recover $2,000 under the False Claims Act because the bank negligently made a material misrepresentation in the certificate of acquisition or construction that induced the FmHA to issue its guaranty. The bank timely appealed from the trial judge’s decision contending (1) that the trial judge incorrectly placed the burden of proof on the bank; (2) that the FmHA’s refusal to permit acceptance of the Coss settlement offer estops the government from challenging the bank’s claim to that extent; and (3) that the bank did not violate the False Claims Act. Each of appellant’s arguments will be discussed in turn.
 

 II.
 
 Burden of Proof.
 

 As stated earlier, the Lender’s Agreement provided that the government’s guaranty obligation was “supported by the full faith and credit of the United States and is incontestable except for fraud or misrepresentation of which the Lender has actual knowledge .. .[,] [and is] unenforceable by the Lender to the extent of any loss occasioned by ... use of loan funds for unauthorized purposes, negligent servicing, or failure' to obtain the required security .... ” At trial, the bank submitted into evidence the contract of guaranty and contended that the FmHA was thus obligated to reimburse the bank for 90 percent of its losses on the Springboro loan. In order to prevent the bank’s recovery on the loan note guaranty the government contended, among other things, that the bank negligently serviced the loan.
 
 [8]
 

 This defense is in the nature of an affirmative defense; therefore, the party raising the defense (here the United States) would normally bear the burden of proof.
 
 See Security State Bank v. United States,
 
 221 Ct.Cl. 942, 946 (1979). The trial judge, however, held that the bank rather than the government had the burden of proof on this issue. Focusing on the bank’s servicing activities after default (i.e., liquidation), the trial judge held that the bank had failed to demonstrate the reasonableness of its liquidation efforts and therefore it had failed to demonstrate entitlement to a recovery on the guaranty. Although the trial judge gave two reasons for shifting the burden of proof to the bank, we believe that these reasons are insufficient to overcome the general rule that the party raising an affirmative defense has the burden of proof on the issue.
 

 First, citing
 
 United States v. Willis,
 
 593 F.2d 247, 258 (6th Cir.1979), the trial judge stated that “[t]he majority of the courts have held that it is the secured party (here the bank) that has the burden of demonstrating that the disposition of collateral was carried out in a commercially rea
 
 *1361
 
 sonable manner.” The
 
 Willis
 
 decision, however, involved section 9-504 of the Uniform Commercial Code, which provides that a secured party’s disposition of collateral after default must be commercially reasonable. It is true that if section 9-504 is properly raised as a defense, many courts will hold that it has the effect of shifting the burden of proof to the secured party.
 
 Id.
 
 at 258. But in this case the appellee did not properly raise its section 9-504 defense. The first time the government raised section 9-504 as a defense was in its post-trial briefs. Section 9-504 was not specifically pled, and there was no consideration of the defense at trial. Therefore, we hold that appellee’s section 9-504 defense was not properly and timely raised, and we thus decline to consider it.
 
 [9]
 

 See United States v. Unum, Inc.,
 
 658 F.2d 300, 305-06 (5th Cir. 1981).
 

 Second, the trial judge held that the bank should bear the burden of proving the reasonableness of its liquidation efforts because it failed to submit a formal liquidation plan to the FmHA for approval. Thus, in the trial judge’s view, if a secured party fails to obtain formal FmHA approval of its liquidation plan, then its liquidation activities are negligent per se. We do not agree. The Lender’s Agreement did provide that the bank had to advise the FmHA of its proposed method of liquidation and provide the FmHA with certain information so that the FmHA could evaluate the bank’s proposed plan.
 
 See
 
 7 C.F.R. § 1841.66(a). One of the purposes here is to provide the FmHA with the option of approving the bank’s liquidation plan or accepting assignment of the loan and conducting its own liquidation.
 
 See
 
 7 C.F.R. §§ 1841.66(b), 1841.67(b). The provision makes no specific reference to what liquidation activities are considered reasonable or unreasonable. We do not think that the failure to provide the FmHA with this option necessarily creates a presumption that the lender’s own liquidation efforts are negligent. We do not think that the FmHA should be able to create a presumption of negligence merely by showing that it did not approve of certain conduct. Instead, we think it more consistent with the nature of an affirmative defense that the appellee in this case be required to prove that the conduct was indeed negligent as claimed.
 

 We also point out that the bank has consistently argued that it did not neglect its responsibilities under the Lender’s Agreement to provide a liquidation plan to the FmHA. Rather, it contended that the parties had fashioned a flexible, ad hoc course of dealings, taking into account the primary debtor’s (Springboro’s) bankruptcy. It was not until September 30, 1982, when the trial judge issued his decision, that the bank learned it had failed to provide the FmHA with a proper liquidation plan. At this time the bank also learned that because of its failure to provide such a plan it had had the burden of proof on the negligent servicing issue at the trial conducted almost a year earlier. For much the same reason as to why we rejected the government’s section 9-504 defense, we reject the trial judge’s reasoning on this point — it was unjust and clearly erroneous to shift the burden of proof to the bank after the trial had already been conducted.
 

 Thus, in this case, the burden of proof on the negligent servicing issue should have been placed on the government. Because the trial judge improperly allocated the burden of proof to the bank, we will, in the interest of judicial economy, examine the evidence of record to determine whether the government has shown that the bank conducted its loan servicing responsibilities in a negligent manner.
 

 III.
 
 Negligent Servicing.
 

 In his decision, the trial judge focused solely on the bank’s servicing efforts after default, i.e., liquidation. He found that from the evidence presented he was unable to “test the reasonableness of the
 
 *1362
 
 bank’s liquidation efforts.” Therefore, he held that the bank failed to prove that it was entitled to recover on the guaranty. We agree with the trial judge that the evidence regarding the reasonableness of the bank’s liquidation efforts is inconclusive. But since the government had the burden of proof on this issue, we believe the trial judge should have held that the government failed to prove that the bank negligently serviced the loan during liquidation. This does not mean, however, that the government failed to prove its case. The loan servicing responsibility of the bank extended not only to debt liquidation, but also to all pre-default actions that were “necessary after loan closing to collect the indebtedness and to protect the security and security rights.” 7 C.F.R. § 1841.46. Although the trial judge did not specifically find that the bank negligently serviced the loan prior to Springboro’s default, we believe that there is ample evidence in the record to support a conclusion of negligent servicing prior to default.
 

 First, there is no dispute that the bank failed to see that the proper hazard insurance for the Springboro plant was obtained as required by the regulations.
 
 See 7
 
 C.F.R. § 1841.46(b). Although the bank was advised by Mr. Coss (one of the personal guarantors) that the proper insurance had been obtained, it never bothered to obtain a copy of the policy to verify its existence or adequacy. The bank’s conduct with regard to this servicing responsibility was certainly negligent. Because of its negligence, the bank was unable to recover the estimated $65,000 in damages that were caused when the roof of the tank room collapsed.
 

 Second, the bank was negligent in monitoring Springboro’s use of the loan funds. The evidence does not indicate even an attempt by the bank to see that the loan funds were used for their intended purposes. What the record does indicate is that of the $367,974.60 deposited in Spring-boro’s account on November 12, 1975, only $1,028.69 remained by February 1, 1976, when the first principal payment on the loan was due. What happened to the loan funds is not absolutely clear because the bank was also negligent in its responsibility to require Springboro to maintain proper books of account.
 
 See 7
 
 C.F.R. § 1842.-71(a)(1). The bank seems to have ignored this obligation altogether. Indeed, the bank was even negligent in maintaining its own records. It is estimated that approximately 27 checks written on Springboro’s account are unaccounted for.
 

 The bank’s failure to monitor properly Springboro’s use of the loan funds enabled the individual and corporate guarantors to use a large portion of the funds for their own benefit. For example, from the records available it seems that the bank’s negligence permitted the guarantors to use at least $145,000 of the loan funds intended for Springboro for unauthorized purposes. Approximately $95,000 was used to pay Dr. Olin’s personal expenses. Another $41,050 was paid to Dr. Olin, Louis LaPree, Howard Coss, and ZMR Corp., apparently for their personal benefit. In addition, $8,500 was paid to Dr. Olin’s cousin.
 

 The appellant does not dispute that Dr. Olin used approximately $95,000 to cover personal expenses, but contends that Dr. Olin also used personal funds to cover Springboro’s business expenses. Only Dr. Olin’s testimony, however, is offered to support this contention. Furthermore, even if this were true, we do not believe we should reward the bank’s negligence in permitting the commingling of loan and personal funds to be asserted as a defense. Funds guaranteed by the FmHA should be used for their intended purposes and a proper record cof their use maintained. The appellant also contends that the approximately $50,000 in payments made to Dr. Olin, his cousin, Louis LaPree, Howard Coss, and ZMR Corp. were actually valid business expenses. Again, the lack of proper books of account makes it impossible to verify appellant’s contention.
 

 Third, the bank was also negligent in overseeing the planned modernization of the Springboro plant and the acquisition and repair of machinery. Section X of the
 
 *1363
 
 Lender’s Agreement provided that it was “the lender’s responsibility to see that all construction is properly planned before any work proceeds; that any required permits, licenses or authorizations are obtained from the appropriate regulatory agencies; that the borrower has obtained contracts through acceptable procurement procedures; that periodic inspections during construction are made and that FmHA’s concurrence on the overall development schedule is obtained.” Although the bank had a duty to see that the planned construction and acquisition and repair of machinery took place, the record indicates that the bank failed to keep a watchful eye on Springboro’s construction and acquisition activities. As a result, only about half of the planned construction and acquisitions may have actually taken place.
 
 [10]
 

 Thus, the evidence clearly indicates that the bank disregarded many of its most basic servicing obligations. Its predefault servicing activities indicate little concern for reasonable banking practices, and there can be no doubt that the government has shown the bank’s servicing of the loan to be negligent. As provided in the Lender’s Agreement, the government’s obligation under the guaranty is thus relieved to the extent of any loss occasioned by the bank’s negligence. In this case, the bank’s negligence was so pervasive that it bears direct responsibility for any loss suffered on the loan. Because of the bank’s negligence, the proper hazard insurance was not obtained, large amounts of money intended for Springboro were instead used for the personal benefit of the individual and corporate guarantors, and apparently only about half of the necessary construction and acquisition and repair of machinery actually took place. The bank’s negligence thus had a direct bearing on the failure of the Springboro venture. Accordingly, we hold that the bank is not entitled to recover on the loan note guaranty-
 

 IV.
 
 The Coss Settlement Offer.
 

 The appellant contends that the FmHA’s rejection of the Coss settlement offer estops the government from challenging its claim to that extent. (Appellant values this amount at approximately $320,-000.) The trial judge, however, held that the FmHA was not “out-of-step in rejecting the settlement offer,” and therefore it was not estopped from challenging appellant’s claim. We agree.
 

 As mentioned earlier, at one point during the liquidation process the Cosses’ attorney indicated that the Cosses might be willing to pay 50 percent of the debt remaining on the loan after all other collection efforts had been exhausted, if the bank would terminate its action against the Cosses. Although this was, as the trial judge found, by no means a “hard” offer, the bank informed the FmHA of this proposal. The only reason the bank could give to the FmHA for accepting this “offer” was that further litigation would postpone the likelihood of full collection for approximately another year and a half. Besides the obvious risks associated with the passage of time, the trial judge found that the bank gave “no economically justifiable explanation ... in favor of its [the settlement offer’s] acceptance.”
 

 Considering the information available to the FmHA, we do not believe it acted unreasonably in rejecting the Cosses’ offer. The FmHA had no indication that the Coss-es’ financial stability was tenuous, or that any legal obstacles prevented recovery against the Cosses. Therefore, from the FmHA’s perspective, the expected gain from litigation exceeded the gain from settlement. A reasonable person would thus have rejected the settlement offer, as did the FmHA.
 

 V.
 
 The False Claims Act.
 

 The False Claims Act provides that “[a]ny person ... who shall ... cause to be presented, for payment or approval ... any
 
 *1364
 
 claim upon or against .. . the United States ... knowing such claim to be false, fictitious, or fraudulent ... shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of doing or committing such Act .... ” 31 U.S.C. § 231 (1976). Applying this statute to the present case, the trial judge held that the government was entitled to a statutory forfeiture of $2,000 because the bank “knowingly” made a material misrepresentation that induced the FmHA to issue its contract of guaranty. The government was not awarded damages, however, as it had not paid out any money on the bank’s claim.
 
 [11]
 

 The bank’s alleged misrepresentation occurred in the “Certificate of Acquisition or Construction.” This form is supposed to be used by the lender to show the construction and acquisition that has been completed by the borrower. In this case, however, the bank used this form to show the allocation that had been made of the loan funds. It allegedly intended only to represent that $185,000 of the loan proceeds had been allocated to the modernization of the plant and the acquisition and repair of machinery, not that the anticipated construction and acquisition had actually been completed. Although this may have been the bank’s intention, the certificate, as completed, clearly gave the impression that the planned construction and acquisition was complete. As a result, the FmHA was induced to issue its contract of guaranty.
 
 [12]
 

 The bank’s misrepresentation that all construction and acquisition had been completed, although perhaps not intentional, was held by the trial judge to be a negligent misrepresentation and “careless indifference to the truth.” The trial judge stated that “to misconstrue a document so otherwise plain in its meaning could perhaps only be explained on the premise that it was read without care or, to be more realistic, not read at all.” Because he found negligent misrepresentations to fall within the knowledge requirement of the False Claims Act, see
 
 Miller v. United States,
 
 550 F.2d 17, 23, 213 Ct.Cl. 59 (Ct.Cl.1977), the trial judge held the bank subject to a $2,000 statutory forfeiture under the Act.
 

 In his analysis, however, the trial judge failed to consider whether the bank’s misrepresentation was sufficient to void the contract of guaranty in its entirety. (As stated earlier, the Lender’s Agreement provided that the loan note guaranty was “incontestable except for fraud or misrepresentation of which the Lender has actual knowledge ....”) The trial judge merely stated that—
 

 [t]he same grounds which the Government urges in support of its counterclaim have also been argued here to support invalidation of the contract of guaranty
 
 *1365
 
 in its entirety. On this score too, the Government may well be right.
 
 See First Nat’l Bank, Henrietta v. Small Bus. Admin.,
 
 429 F.2d 280, 287 (5th Cir.1970). However, since thd question of liability has been decided in the Government’s favor on other grounds, there is no need now to expand discussion of the bank’s misrepresentation beyond the recognition of its liability under the False Claims Act.
 

 We believe that in this case the trial judge had to consider this issue in order to hold the bank liable under the False Claims Act. Without a finding that the bank’s negligent misrepresentation in the certificate of acquisition or construction was sufficient to void the government’s obligation under the contract of guaranty, we do not believe that the bank can be considered to have submitted a false claim within the meaning of the False Claims Act.
 

 In guaranty cases, two types of misrepresentations may be present: primary and secondary. Primary misrepresentations are those misrepresentations that induce the government to issue the contract in the first place. The bank’s negligent misrepresentation in the certificate of acquisition or construction was such a misrepresentation. These misrepresentations are different from and have no bearing on the lender’s later claim for reimbursement unless they are deemed sufficient to void the contract of guaranty. Without such a finding, the lender’s claim for payment under the guaranty contract is a valid, enforceable claim that is not false in any manner. Secondary misrepresentations, on the other hand, are those misrepresentations that occur after the contract of guaranty is issued and are about the actual claim for reimbursement under the guaranty contract. For example, a lender, in its claim for reimbursement, might knowingly misrepresent the amount of loss it is entitled to recover under the guaranty contract. The lender’s misrepresentation would render the claim for payment upon the United States false to the extent of the exaggeration and thus liability attaches under the False Claims Act.
 

 As mentioned above, in this case the bank negligently committed a primary misrepresentation. The trial judge, however, made no finding that this misrepresentation in any way affected the bank’s contractual and legal right to reimbursement under the contract of guaranty. Thus, it has not been shown that the bank’s negligent ^primary misrepresentation rendered its subsequent claim for payment upon the United States false in any respect nor did the trial judge find otherwise.
 
 [13]
 
 Consequently, we believe that the False Claims Act should not have been applied in this case. To hold otherwise would produce anomalous results: For example, if the trial judge’s analysis were followed, a lender may be held entitled to recover under the guaranty contract, but then be held liable under the False Claims Act for making certain negligent misrepresentations that had no effect on the validity of the lender’s right to reimbursement under the guaranty if the claim thereunder was not false. Conceivably, the lender would not only be liable for the $2,000 statutory forfeiture, but also for double the amount of money the government was required to pay the lender on its claim. The lender would thus be faced with the absurd result of actually losing money by submitting a claim for reimbursement under a guaranty contract that is valid in all respects.
 

 Therefore, we reverse the trial judge’s holding that the bank is subject to a statutory forfeiture of $2,000 under the False Claims Act. The bank’s alleged negligent
 
 *1366
 
 misrepresentation was not shown to affect the validity of the guaranty contract held by the bank and the bank thus cannot be considered to have submitted a false claim for payment to the United States.
 

 VI.
 
 Conclusion.
 

 In conclusion, the trial judge’s decision to allocate the burden of proof in this case to the bank was improper and is rejected. The government’s contention that the bank negligently serviced the loan was in the nature of an affirmative defense, and thus the government should bear the burden of proof on this issue. We believe that the reasons given by the trial judge to shift the burden of proof to the bank were insufficient in this case to overcome the general rule that the party raising an affirmative defense has the burden of proof on it.
 

 Even though the trial judge improperly allocated the burden of proof, we believe the evidence of record is sufficient to affirm the trial judge’s decision that the bank is not entitled to recover on the guaranty. The evidence clearly indicates that the bank disregarded many of its most basic pre-de-fault servicing obligations and expressed little concern for reasonable, prudent banking practices. The bank’s negligence was so pervasive that it contributed to the failure of the Springboro venture and thus the bank bears responsibility for the loss suffered on the loan.
 

 We also affirm the trial judge’s decision concerning the Coss settlement offer. Given the information available to the FmHA, its rejection of the settlement offer was not unreasonable.
 

 Finally, we must reverse the trial judge’s decision that the bank is subject to a $2,000 statutory forfeiture under the False Claims Act. The bank’s misrepresentation in this case was not found to have any effect on the bank’s claim for reimbursement under the guaranty. There was no finding that the bank’s misrepresentation was sufficient to void the contract of guaranty, or that the misrepresentation made the bank’s claim for reimbursement false in any way. Therefore, we believe it would be inappropriate to apply the False Claims Act to the situation presented here.
 

 Accordingly, after thorough consideration of the parties’ submissions and after oral argument, the judgment of the United States Claims Court denying appellant any recovery is affirmed, but sections of the trial judge’s opinion in reaching this correct result are rejected, and the Claims Court’s judgment awarding appellee $2,000 under the False Claims Act is reversed.
 

 AFFIRMED IN PART.
 

 REVERSED IN PART.
 

 NIES, Circuit Judge, would remand on the issue of the government’s counterclaim under the False Claims Act.
 

 *
 

 Pursuant to an order of the court dated October 4, 1982, Judge Wiese, on October 8, 1982, entered a judgment in accordance with his opinion of September 30, 1982.
 

 [1]
 

 . 7 U.S.C. § 1932(a) (Supp. V 1981) authorizes the Secretary of Agriculture to “make and insure loans to public, private, or cooperative organizations organized for profit or nonprofit ... for the purposes of (1) improving, developing, or financing business, industry, and employment and improving the economic ... climate in rural communities .... ” Pursuant to this authority, the Secretary of Agriculture established a Business and Industrial Loan Program to be operated by the Farmers Home Administration (FmHA).
 

 [2]
 

 . The purpose of the conditional commitment for guaranty is “to advise the lender that the material submitted by the lender ... is approved subject to the conditions and requirements set forth in the form, and that ... a Contract of Guarantee [will be issued] if all such conditions and requirements and others set forth in this Handbook prerequisite to issuance of the Contract of Guarantee, are met .. ..” 7 C.F.R. § 1841.24 (1974).
 

 [3]
 

 . 7 C.F.R. § 1841.26 provides in relevant part:
 

 “The Contract of Guarantee will not be issued until:
 

 “(a)
 
 Lender’s and borrower's advice.
 
 The lender and borrower in Business and Industrial loan cases (the lender only in other cases unless otherwise provided in the additional provisions in the Part applicable to the particular type of loan involved) advise(s) FHA that:
 

 “(1) No major changes have been made in the loan conditions and requirements since the request was made for issuance of a conditional commitment to guarantee the loan except those, if any, that have been approved in the interim period by FHA in writing. Other changes within the approved loan purposes that do not increase the cost, require additional time, or adversely affect the objectives or soundness of the loan may be approved by the borrower and lender.
 

 “(2) In Business and Industrial and Housing loan cases, all planned property acquisition has been completed, and all construction, repair, and development has been properly completed in accordance with plans and specifications and the cost thereof has not exceeded the amount approved by FHA.
 

 ******
 

 “(4) The loan has been properly closed, and the required security instruments have been (or will be) obtained.
 

 “(5) The borrower has title marketable in fact to the security property then owned by him or it, subject only to the instruments securing the loan to be guaranteed and any other exceptions approved in writing by FHA.
 

 “(6) Security property then owned by the borrower (and/or that which will be acquired, repaired, constructed, or developed with loan funds after issuance of the Contract of Guarantee in Farmer Loan cases), is considered adequate security for the loan to be guaranteed, and the security instruments covering such property are all properly filed or recorded, as appropriate and legally permissible.
 

 “(7) Proper hazard and any other required insurance is in effect.”
 

 [4]
 

 . Although these obligations were owed to the bank, the bank did not indicate this fact in the certificate of acquisition or construction.
 

 [5]
 

 . The bank never filed suit against Mrs. Olin although she also personally guaranteed the loan.
 

 [6]
 

 . Denial of the bank’s reimbursement claim was based on the following grounds: (1) that the loan funds had been used for unauthorized purposes; (2) that the bank had been negligent in servicing the loan; (3) that the bank had failed to carry out any approved liquidation plan expeditiously; and (4) that legal fees sought as a part of the loss were unreasonable.
 

 [7]
 

 . On October 1, 1982, after the trial judge had issued his “report on the merits,” this action was transferred to the court pursuant to section 403(a) of the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 96 Stat. 25,
 
 *1360
 
 57 -58. Because the trial judge’s decision was a “final decision” within the meaning of 28 U.S.C. § 1291, we have jurisdiction over this appeal.
 
 See id.
 
 § 127(a), 96 Stat. 38 (to be codified at 28 U.S.C. § 1295(a)(3)).
 

 [8]
 

 . The government also contended that the bank made numerous misrepresentations in its request for the contract of guaranty, that the bank used a portion of the loan funds for unauthorized purposes, and that the bank failed to perfect its security interest in certain collateral. The trial judge did not determine the validity of these contentions as he held that the bank’s negligent servicing prevented its recovery on the guaranty. We also find it unnecessary to reach these issues, as we affirm the trial judge on the negligent servicing issue.
 
 See infra
 
 Part III.
 

 [9]
 

 . We express no view whether the government’s section 9-504 defense would have been applicable in this case if properly raised.
 

 [10]
 

 . Although there was competing testimony, the trial judge determined that only $90,200 of the loan funds were spent on construction and acquisition activities, leaving $94,800 unaccounted for on the nonworking capital portion ' of the loan. '
 

 [11]
 

 . Although the trial judge held the bank liable under the False Claims Act, he failed to consider whether the Act was actually applicable to the bank’s claim for reimbursement. The Supreme Court has expressly left open the question whether “a lending institution’s demand for reimbursement on a defaulted loan originally procured by a fraudulent application would be a ‘claim’ covered by the False Claims Act.”
 
 United States v. McNinch,
 
 356 U.S. 595, 599 n. 6, 78 S.Ct. 950, 952 n. 6, 2 L.Ed.2d 1001 (1958). Subsequent cases have applied the False Claims Act in situations where there has been a
 
 payment by the government
 
 under the terms of an FHA guaranty that was induced by false representations.
 
 See United States v. Hibbs,
 
 568 F.2d 347 (3d Cir.1977);
 
 United States v. Ekelman & Associates, Inc.,
 
 532 F.2d 545 (6th Cir.1976);
 
 United States v. Veneziale,
 
 268 F.2d 504 (3d Cir.1959);
 
 United States v. Globe Remodeling Co.,
 
 196 F.Supp. 652 (D.Vt. 1960 & Supp.Op.1961). See
 
 also United States
 
 v.
 
 Polly,
 
 255 F.Supp. 610 (W.D.N.C.1966). In this case, however, the government did not make any payment under the guaranty. But at least one court has applied the False Claims Act in a guaranty case when there has not been a payment on the guaranty by the government.
 
 See United States v. Ridglea State Bank,
 
 357 F.2d 495 (5th Cir.1966). Whether the distinction between payment and nonpayment on the guaranty has any merit need not be discussed here as we have found the False Claims Act inapplicable on other grounds,
 
 infra.
 

 [12]
 

 . In Business and Industrial Loan cases, the contract of guaranty may not be issued until the lender certifies that all planned property acquisitions, construction, repair, and development is complete.
 
 See
 
 7 C.F.R. § 1841.-26(a)(2).
 

 [13]
 

 . In his decision, the trial judge merely found that the bank committed a negligent misrepresentation in one of the application forms for the contract of guaranty. The making of misrepresentations in applications for government guaranties, however, is not, in and of itself, a false claim within the meaning of the False Claims Act. See
 
 United States v. McNinch,
 
 356 U.S. 595, 598-600, 78 S.Ct. 950, 952-53, 2 L.Ed.2d 1001 (1958). More is required. In order to determine whether a false claim for payment has been presented upon the United States, a court must focus on the actual claim for reimbursement under the guaranty contract. In this case, there was no finding that the bank’s misrepresentation made its claim for reimbursement invalid or false in any respect.