**FIRST INTERSTATE BANK OF BILLINGS, N.A., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 90–572 C.

United States Court of Federal Claims.

Dec. 18, 1992.

Lawrence B. Cozzens, Billings, MT, for plaintiff.

Allen D. Bruns, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Washington, DC, for defendant. Lorraine D. Gallinger, Billings, MT, and Mark D. Lodine, Missoula, MT, of counsel.

## OPINION AND ORDER

TURNER, Judge.

First Interstate Bank of Billings, N.A., brought this action to collect on a Farmers Home Administration (FmHA) Loan Note Guarantee issued to insure 90 percent of a $400,000 loan made by the bank to the DeJaegher Ranch Corporation.[1] The FmHA had refused payment on the guaranty, claiming that a material misrepresentation by a bank officer at the signing of the guaranty contract caused it to be void. Defendant maintains that same defense here and also asserts four counterclaims, one contending that plaintiff's request for

payment under an invalid guaranty is actionable under the False Claims Act, 31 U.S.C. § 3729 (1988), and three based on a separate emergency loan made by FmHA directly to the ranch corporation.

This opinion addresses plaintiff's renewed motion filed April 6, 1992 for summary judgment. Defendant argues that summary judgment is inappropriate because there exist significant factual disputes concerning plaintiff's knowledge of reversals in the DeJaegher Ranch's business fortunes at the time the guaranty was signed.

## I

Plaintiff bank, on August 26, 1986, obtained from FmHA a Conditional Commitment for Guarantee. A Conditional Commitment is a promise to issue a final Loan Note Guarantee upon the meeting of certain conditions.

The occasion for the FmHA's final guaranty was the restructuring of $400,000 in preexisting indebtedness owed by the ranch to the bank. The restructuring agreement was consummated by the ranch and the bank on November 3, 1986, more than six weeks before the final Loan Note Guarantee insuring 90 percent of the $400,000 debt was signed on December 16, 1986.

A condition precedent to the final guaranty was that the bank certify that there had been no "adverse changes in the borrower's financial condition nor any other adverse change(s) in the borrower during the period of time from FmHA's issuance of the Conditional Commitment for Guarantee to issuance of the Loan Note Guarantee" (Def.App. at 100).

The DeJaegher Ranch failed some time after the guaranty was executed. The ranch corporation defaulted on its loan from First Interstate. (The record does not specifically indicate whether the DeJaeghers also defaulted on their individual obligations; however, it is not disputed that

---

1. Thomas and Catherine DeJaegher, the ranch owners, also signed the note individually. As of March 12, 1992, the ranch had paid $20,000 of the $400,000 principal indebtedness (Pl. Brief at

6). The bank seeks payment from the FmHA of $342,000 (90 percent of the $380,000 outstanding principal) plus interest.

the loan from the bank to the ranch corporation is in default (Answer, ¶ 7)). Thus, if the guaranty is valid, it is payable.

In February 1987, the bank first sought payment from the FmHA under the guaranty. The FmHA refused, asserting that the Loan Note Guarantee was "null and void" (FmHA letter of May 28, 1987, Def. App. at 113), because the bank had known of a material adverse change in the ranch corporation's business condition prior to the Guarantee closing and had not shared this information with the FmHA. Specifically, the FmHA charged that Scott Johnson, a First Interstate vice-president, knew at the time of the guaranty closing that Oppenheimer Industries had removed its cattle from the DeJaegher land. Since 1982, the DeJaegher Ranch had relied on an annual cattle lease arrangement with Oppenheimer for a significant portion of its income.

The cattle had been removed on November 21, 1986. The FmHA, basing its conclusion on a March 9, 1987 letter it received in response to a request for information from Tom DeJaegher, formed the belief that Johnson knew about the cattle removal on December 10, 1986. Johnson disputes this and has maintained throughout extensive discovery in a prior district court proceeding (dealing with a claim on an emergency loan made directly to the DeJaegher Ranch Corporation by the FmHA) that he did not know of the cattle removal when the guaranty closed on December 16, 1986. Though Johnson has never acknowledged knowing of the removal as early as December 16, 1986, he has at various times claimed different dates for his knowledge. In deposition testimony subsequent to his March 9, 1987 letter, DeJaegher stated that he is not sure exactly when he told Johnson of the cattle removal, and that the letter to the FmHA used the language "I think" and "on or about Dec. 10" to highlight this uncertainty (Affidavit of DeJaegher, Def. App. at 134).

Before the Loan Note Guarantee was issued, FmHA officials had independently heard rumors that Oppenheimer Industries might be rearranging its cattle leasing operations in the area. The FmHA, like the bank, also knew that the Oppenheimer lease had on its face expired in October 1986. This did not cause concern at either the bank or the FmHA, as the typical course of dealing between Oppenheimer and the DeJaeghers had been to conclude during January an annual lease running from the previous October to the next October.

DeJaegher maintains that he had been told by Oppenheimer Industries of a possible impending change in the leasing arrangement, that he relayed this to Johnson in August or September of 1986 and that he had at that time mentioned to Johnson the possibility that the cattle might be removed. Johnson recalls only that DeJaegher told him the cattle lease might be restructured, but not that there was a risk of the cattle's removal.

## II

In the summary judgment motion at bar, the bank asserts that the sole issue before the court on the main claim is whether Johnson had actual knowledge of the removal of the cattle on December 16, 1986. Plaintiff argues that if defendant cannot prove Johnson's actual knowledge of the cattle removal on that date, then plaintiff must prevail.

Defendant asserts that the bank did have actual knowledge of the cattle removal on December 16, 1986. Defendant urges alternatively that actual knowledge of adverse changes is not necessary under the guaranty to render it void, but rather that negligent misrepresentation is sufficient. Defendant further maintains that plaintiff's alleged knowledge in advance of signing the guaranty of the *possibility* of the cattle's removal is enough to void the guaranty, since failure to relay such information to FmHA constituted a material misrepresentation.

Count I of the government's counterclaim seeks damages for the bank's alleged violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)–(2) (1988), resulting from an improper claim for payment under the guaranty. Defendant, as in the main

claim, asserts that proof of negligence is sufficient to support a False Claims Act suit and that a showing of actual knowledge is not required. Defendant also takes issue with each of the bank's three legal defenses, to wit, (1) that the guaranty contract is valid, and that no request for payment under a valid contract can be actionable as a false claim; 2) that the False Claims Act only applies where the United States has suffered financial loss, an impossibility in this case unless the guaranty is valid; and 3) that a fraudulent application for a guaranty cannot alone support False Claims Act liability, since the eventual claim for payment (rather than the initial application) is what must be proved false.

Counterclaim Counts II, III and IV are based on an emergency loan made by the FmHA directly to the DeJaegher Ranch Corporation. The bank maintains that these counts are precluded due to an earlier district court final order based on a settlement between the bank and the government concerning the same loan. The United States in that case asserted different legal theories from those asserted here. Defendant maintains that it is precluded by the district court settlement only as to the legal theories it actually asserted in the earlier action. Since the legal theories pleaded here are different, *res judicata* does not apply, according to defendant.

### III

### A

The terms of the guaranty contract provide that the "Guarantee ... is incontestable except for fraud or misrepresentation of which Lender ... has actual knowledge at the time it became such Lender ... or which Lender ... participates in or condones" (Def.App. at 59). Hereinafter, this will be referred to as the "incontestability clause." The incontestability clause is

largely derived from the Emergency Agricultural Credit Adjustment Act of 1978 ("the Act"), authorizing the FmHA to guarantee loans.[2]

Plaintiff contends that a merely negligent misrepresentation is not enough to allow the government to contest the guaranty and that actual knowledge is required. Defendant, on the other hand, asserts that negligent misrepresentation is enough to void the contract.[3]

As a general principle of contract law, a misrepresentation of material fact renders a contract voidable by the misled party. *Pacific Architects & Eng'rs, Inc. v. United States*, 203 Ct.Cl. 499, 513, 491 F.2d 734, 742 (1974). Knowledge of falsity or some other evidence of intent to deceive is usually required to establish misrepresentation. *La Crosse Garment Mfg. Co. v. United States*, 193 Ct.Cl. 168, 175, 432 F.2d 1377, 1381–82 (1970). However, there are "limited circumstances in which negligent misrepresentation is recognized...." *Id.*

One such circumstance is created by the fiduciary relationship which arises when a private lender attempting to insure risky loans seeks a guaranty from a government agency. Under this fiduciary relationship, the government relies on the professional judgment and thoroughness of the lender; the lender who has held himself out as a skilled businessman is under a duty of care to provide the government with information material to the soundness of the loan. *First Nat. Bank, Henrietta v. Small Business Admin.*, 429 F.2d 280, 287 (5th Cir.1970). As with most duties, this duty of reasonable care can be breached through negligence. Therefore, the United States correctly concludes that a negligent misrepresentation of fact by the lender usually voids the guaranty, since a contract "should not be construed to permit an in-

---

2. "Any ... guarantee ... shall be ... incontestable except for fraud or misrepresentation of which the holder has actual knowledge at the time it becomes a holder." Emergency Agricultural Credit Adjustment Act of 1978, § 208, 7 U.S.C.A.Prec. § 1961 (1988) (repealed 1990). The repealed Act is found in unofficial codes as a note preceding 7 U.S.C. § 1961.

3. Defendant seeks a ruling that a misrepresentation of a material adverse change is enough to void the contract. However, by the language of the guarantee itself, the actual result of such a misrepresentation would not be to void the contract, but rather to render it contestable.

demnitee to recover for his own negligence *unless* the court is firmly convinced that such an interpretation reflects the intention of the parties." *United States v. Seckinger*, 397 U.S. 203, 211, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970) (emphasis added); *accord California–Pacific Utils. Co. v. United States*, 194 Ct.Cl. 703, 719 (1971). However, before application of this doctrine, the contract itself must be examined.

■ The instant case in one crucial way differs from *Henrietta*. Here, the guaranty contract, guided by the Act, unambiguously requires that the lender have actual knowledge of any fraud or misrepresentation in order for the government to be able to contest the guaranty on those grounds. We believe, with respect to the guaranty clause at issue here, that the requirement of actual knowledge reflects the intent of the parties at the time the contract was formed, and of Congress in passing the Act. Where a guaranty contract follows statutory guidance by requiring actual knowledge of a misrepresentation to render a guaranty voidable, the *Henrietta* exception allowing negligent misrepresentation to suffice is not applicable.

### B

Such an interpretation is in accord with the relevant prior decisions in the Federal Circuit construing the same incontestability clause in loan guaranty contracts. *Everman Nat. Bank v. United States*, 756 F.2d 865 (Fed.Cir.1985); *Colorado State Bank of Walsh v. United States*, 18 Cl.Ct. 611 (1989) (Harkins, J.), *aff'd without opinion*, 904 F.2d 45 (Fed.Cir.1990). Though neither decision deals specifically with the question of whether negligent misrepresentation is enough to make the guaranty contestable, each is instructive.

In Walsh,[4] the court stated that "[f]raud as used in the Contract of Guarantee is measured under common law definition." 18 Cl.Ct. at 629. The court relied on Feder-

al Circuit precedent to define the requisite state of mind for common law fraud as " 'intent to deceive or a state of mind so reckless respecting consequences as to be the equivalent of intent' " *Id.* (quoting *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), cert. denied, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985)).

In defining the standard for misrepresentation under the incontestability clause, the court in *Walsh* assumes that a misrepresentation must be "material." 18 Cl.Ct. at 629. The test for materiality concerns the weight of the misrepresented fact: It must be "vital to the soundness of the loan.... [It] must go to the essence of the transaction...." 18 Cl.Ct. at 629–30. To be misrepresented, a false statement must be put forth with "knowledge of its falsity or other evidence of an intent to deceive." 18 Cl.Ct. at 630 (citing *La Crosse Garment Mfg. Co. v. United States*, 193 Ct.Cl. 168, 432 F.2d 1377 (1970)). Perhaps most usefully for the case at bar, the Claims Court noted that "[n]ondisclosure of information that is known and is vital to the soundness of the loan amounts to a material misrepresentation." 18 Cl.Ct. at 629 (citing *Everman Nat. Bank v. United States*, 5 Cl.Ct. 118 (1984), *aff'd*, 756 · F.2d 865 (Fed.Cir. 1985)).

In the *Everman* appeal, the Federal Circuit found that a guaranty contract creates "the peculiar confidence of a fiduciary relation." 756 F.2d at 868. Out of this fiduciary relationship arises a duty to disclose which is "limited by the rule of materiality." 756 F.2d at 869. The materiality standard hinges on "whether a prudent and reasonable banker would have reason to know that FmHA would regard as important the fact" alleged to have been misrepresented. *Id.* The duty to disclose applies to all information which is not "either irrelevant or trivial." *Id.* The Federal Circuit in *Everman* limited its discussion of the duty created by the guaranty contract to a

---

**4.** The entire discussion in *Walsh* concerning the elements of fraud and misrepresentation applicable under the incontestability clause is dicta. The holding of the case did not rely at all on construction of the incontestability clause; rath-

er, *Walsh* turned on the scope of authority of government officials to guarantee a loan when they had not complied with the regulatory requirement of a current appraisal of chattel. 18 Cl.Ct. 611, 632–33.

duty to disclose; actual knowledge of the material fact which must be disclosed seems to be a presumed requirement.

Thus, the Federal Circuit's principal pronouncement on the incontestability clause at issue today implies that actual knowledge, including an intent to deceive, is required under the incontestability clause before an FmHA Loan Note Guarantee can be successfully contested by the government. As noted above in the discussion of *Walsh*, the Federal Circuit's implied requirement of an intent to deceive is in accord with the common law concept of misrepresentation.[5] This implication however, is not necessary to the holding in either *Walsh* or *Everman*, and so is dicta.

Based on the incontestability clause language in the Act and in the Loan Note Guarantee and the dicta from *Everman* and *Walsh*, we hold that an FmHA-guaranteed lender's actual knowledge of a material adverse change in the borrower's business, and thus an intent to deceive at the guaranty closing, must be proved before the government can successfully contest the guaranty. Such a contest will require proof that the United States relied to its detriment on the alleged misrepresentation.

## IV

### A

■ In moving for summary judgment, plaintiff makes a strong argument that Johnson's testimony on his knowledge of the cattle removal before the signing of the guaranty is not directly contradicted by any admissible evidence. Plaintiff's argument that the existence or not of this knowledge is the only issue in the case is somewhat less strong. But even if the court were to accept both arguments, summary judgment would not be granted at this juncture.

While it is true that a court may not grant summary judgment when a material factual dispute exists, courts have some latitude to deny summary judgment even

when there is technically no such dispute. "[I]n most situations in which the moving party seems to have discharged his burden of demonstrating that no genuine issue of fact exists, the court has discretion to deny a Rule 56 motion.... [T]he court should have the freedom to allow the case to continue when it has any doubt as to the wisdom of terminating the action prior to a full trial." 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2728 at 187–88 (1983) (footnotes omitted); *see Anthony Grace & Sons, Inc. v. United States*, 170 Ct.Cl. 688, 691–92, 345 F.2d 808 (1965), *rev'd on other grounds*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

In the litigation at bar, even if plaintiff's entire statement of the case were accepted, we would be reluctant to deny the government a full airing of its case. While it is true that Johnson has at various times put different dates to his first knowledge of the cattle removal, plaintiff vigorously points out that all dates indicated by Johnson are after the key date of December 16, 1986. The strongest evidence to the contrary, DeJaegher's letter to the FmHA stating that Johnson was informed "on or about Dec. 10," is ambivalent on the fact of Johnson's state of knowledge on December 16, 1986. Technically, summary judgment on this fact could be granted, but we feel that doing so could be unfair. Such unfairness is especially likely to arise when summary judgment is sought in fact-intensive cases such as the one at bar. *See Young Enterprises, Inc. v. United States*, 26 Cl. Ct. 858, 866 (Cl.Ct.1992). In some such cases, a judge should undergo the factual immersion which can only occur at trial.

This case has a human dimension not appropriate for evaluation on the arid record. The record indicates that untruths or misleading statements may have been made. DeJaegher, in his eagerness that the bank continue to extend credit to his struggling ranch, could have misled the bank about his Oppenheimer cattle lease. Likewise, it is possible that Johnson, repre-

---

5. *E.g., La Crosse Garment*, 193 Ct.Cl. 168, 175. See also Black's Law Dictionary 903 (5th ed. 1979) ("A 'misrepresentation,' which justifies the rescission of a contract, is ... made with the intent to deceive or mislead.").

senting a bank which had large unguaranteed loans to DeJaegher, might have misled the FmHA. On the other hand, it is possible that both men acted in good faith throughout, and that simple misunderstood communications led to the present confusion. In short, the credibility of witnesses is crucial to this case. For this reason, even though it is possible to state that no evidence directly contradicts plaintiff's testimony on a crucial issue, summary disposition is inappropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970); *Young Enterprises,* 26 Cl.Ct. 858 (1992).

### B

In addition, contrary to plaintiff's contention, knowledge of the cattle removal might not be the only issue in this case. Defendant points to evidence that Scott Johnson had been informed well before December 1986 of the *possibility* that the Oppenheimer cattle lease might be restructured or terminated. DeJaegher, in an affidavit of November 18, 1989, unequivocally stated that he informed Johnson of this in August or September 1986 (Def.App. at 109–10). Though the record is somewhat unclear, it seems that Johnson disputes this only in part, maintaining that though DeJaegher had told him that the Oppenheimer cattle lease might be restructured, he was not told that the deal might end (Pl. Reply Brief at 9; Def.App. at 111). If the possibility of removal amounted to a material adverse change of which the bank had actual knowledge, the guaranty would be contestable because of misrepresentation.

The question of detrimental reliance also remains. The bank contends that the FmHA had independently learned of potential changes in the Oppenheimer operation, and therefore did not rely on the bank for information on the cattle removal or possibility of removal (Pl. Reply Brief at 9). The bank also points out that the FmHA knew that the Oppenheimer lease expired in October 1986, and thus should have been on notice to determine the status of the lease independently.

In sum, we would not grant summary judgment even if the issue of Johnson's knowledge of the cattle removal were the only issue at bar. But this may not be the only issue: it is conceivable that the possibility of the cattle removal was a material adverse change of which the lender had actual knowledge. The extent of the bank's knowledge of this possibility is unclear, and the bank at any rate disputes the materiality of any such knowledge. (There appears to be no dispute over the materiality of the bank's alleged knowledge of the actual removal of the cattle.) Additionally, it appears that there may be genuine disputes as to the extent of the FmHA's reliance on the lender for information of the cattle removal or its possibility. The bank contends that the FmHA had independent sources for such information. For these reasons, summary judgment on plaintiff's primary claim is inappropriate at this juncture.

### V

■ In its first counterclaim, defendant asserts under the False Claims Act, 31 U.S.C. § 3729 (1988), that First Interstate made a false claim when it tried to collect under the guaranty. The bank argues that this counterclaim must necessarily fail if the guaranty is held to be valid, since any other rule risks the anomalous result that a party with a valid guaranty claim could be liable under the False Claims Act. We follow the Federal Circuit in agreeing with the bank's position. *Brunswick Bank & Trust Co. v. United States,* 707 F.2d 1355, 1365 (Fed.Cir.1983). Further, for purposes of False Claims litigation based on an alleged misrepresentation in applying for a loan guaranty containing an incontestability and actual knowledge clause, a merely negligent misrepresentation cannot be the basis for liability. Defendant's reliance on *United States v. Miller,* 645 F.2d 473 (5th Cir.1981), is misplaced, since the Federal Housing Authority guaranty statute in that case did not contain an actual knowledge proviso. 645 F.2d at 477 n. 5.

Plaintiff then argues that even if the guaranty is held to be void, a false application for a loan guaranty can never support a False Claims action. For this proposition, plaintiff cites *United States v. Hill*, 676 F.Supp. 1158, 1174–76 (N.D.Fla.1987).

Plaintiff fails to distinguish a false application for a guaranty, which arguably is not actionable under the False Claims Act, from a request for payment under an ill-gotten guaranty, which plainly can be actionable. While relying on *Hill*, plaintiff ignores a statement in that case dealing, like counterclaim Count I in the present case, with 31 U.S.C. § 3729(a)(1)–(2): "It is true that [one] who submits a false statement in a loan guaranty application may be held liable for the damage incurred by the United States as a result of the ultimate false claim." 676 F.Supp. at 1174 (citation omitted).

In the case at bar, it is not disputed that plaintiff has made a claim for payment under the Guarantee. If the Guarantee was proved to be the fruit of plaintiff's knowing misrepresentation, the plaintiff could be liable under the False Claims Act for its subsequent claim for payment.[6]

In this case, the fact of plaintiff's actual knowledge of a misrepresentation at the time of signing is disputed. For this reason, counterclaim Count I does not present a question which can be disposed of by summary judgment.

## VI

### A

An earlier district court case between the same parties litigated a dispute arising from a separate $91,640 emergency loan directly from the FmHA to the DeJaegher Ranch Corporation. *United States v. First Interstate Bank of Billings, N.A. et al.*, No. CV 88–54–BLG–JFB (D.Mont. Mar. 5, 1991) (Def.App. at 157–79). Counterclaims II, III and IV involve that emergency loan.

In the district court, the government demanded that the bank compensate the FmHA for the $91,640 emergency loan to the DeJaegher Ranch. As in this case, the government maintained that Johnson misled it regarding the removal of the Oppenheimer cattle. The government claimed that it was relying on the absence of adverse information from the bank when it made the emergency loan to the ranch, which then paid the bulk of the money to the bank. Thus, though the emergency loan had technically been made to the ranch corporation, the government argued that in fact the bank was liable for unjust enrichment because of its failure to inform the FmHA of the cattle removal.

The summary judgment motions of the bank and the United States were fully denied because material facts were disputed (Def.App. at 171, 174, 178–79). Thereafter, the government and the bank reached a settlement under which the bank paid $34,169.24 to the United States (Pl.App. at 153). Accordingly, a stipulated order was entered dismissing the case with prejudice on November 18, 1991 (Pl.App. at 157).

### B

In the district court action, which dealt only with the emergency loan, the United States pleaded theories of constructive fraud, violation of good faith and fair dealing, negligent misrepresentation by silence and unjust enrichment (Pl.App. at 131). Concerning the instant counterclaims dealing with the same emergency loan, the United States asserts the False Claims Act, 31 U.S.C. § 3729(a)(1)–(2), as the basis for recovery under Count II, unjust enrichment as the basis for recovery under Count III and payment by mistake as the basis for Count IV. Plaintiff contends that these counterclaims are barred. We agree.

■ "In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litiga-

---

6. It may be that even in the absence of payment by the United States on a guaranty, a lender guilty of knowing misrepresentation in its application for a Loan Note Guarantee could be liable under the False Claims Act. *See United*

States v. Ridglea State Bank, 357 F.2d 495, 497 (5th Cir.1966) (citing cases and holding that a False Claims action exists prior to payment in part because the government is forced to expend money in investigating the false claim).

tion on the claim presented but are not intended to preclude further litigation on any of the issues presented. Thus, consent judgments ordinarily support claim preclusion but not issue preclusion." 18 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 4443 at 384–85 (1981) (footnote omitted).

■ The district court's order, stipulated by the parties, provided "that *all of the claims* herein asserted by the plaintiff herein [i.e., the United States] have been fully compromised and discharged, and the captioned matter should be and hereby is *dismissed with prejudice*" (Pl.App. at 157) (emphasis added).

One of the basic principles of *res judicata* (now usually called claim preclusion) is that a party may not repeatedly try the same claim by merely using different legal theories. When a suit is maintained, the party claiming relief has an obligation to assert all the legal theories which he or she intends to use. Failure to raise a theory is generally not forgiven in subsequent litigation, because the parties have a right to a final disposition of the claim.

In determining what constitutes a distinct claim, federal courts recently have tended to adopt a transactional definition. A separate cause of action is said to arise from each distinct " 'transaction and occurrence,' " *W.L. Gore & Assoc., Inc. v. Int'l Medical Prosthetics Research Assoc., Inc.*, 975 F.2d 858, 862 (Fed.Cir.1992) (quoting *Cold Metal Process Co. v. United Eng'g & Foundry Co.*, 351 U.S. 445, 452, 76 S.Ct. 904, 908, 100 L.Ed. 1311 (1956)), or from the "same operative facts," *UNR Industries, Inc. v. United States*, 962 F.2d 1013, 1023 (Fed.Cir.1992), or from other equivalent language. A claim "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments, § 24(1) (1981). The existence of a single transaction is established when "the facts are related in time, space, origin, or motivation...." *Id.* at § 24(2).

Counterclaims II, III and IV present a near-perfect identity of facts with the earlier action. No facts other than those needed to win the earlier suit are needed to prevail on these three counterclaims; the only difference is in the legal theories asserted. In addition, no mutual intent to limit preclusion of the claims asserted in the earlier action can be discerned in the stipulated settlement. We conclude that counterclaim Counts II, III and IV are based on claims which have already been the subject of a final judgment and that, consequently, defendant is precluded from reasserting those claims in this action.

## VII

We make the following observations to narrow the issues at trial:

1. The government has the burden to prove that the bank withheld actual knowledge of a material adverse change in the borrower's condition prior to issuance of the Loan Note Guarantee and that FmHA relied to its detriment on such a misrepresentation. (The parties do not dispute that the bank's alleged pre-Guarantee knowledge of the removal of cattle would, if proved, constitute a material adverse change; however, all aspects of the allegation except materiality are disputed and remain for proof at trial.)

2. Before the guaranty-in-suit could be voided due to plaintiff's alleged knowledge of the possibility of removal of the Oppenheimer cattle from the DeJaegher ranch, all elements of such ground, including materiality, must be proved.

3. Concerning Count I of defendant's counterclaim (based on the False Claims Act), as a matter of law, defendant cannot prevail if the guaranty contract is valid.

## VIII

Based on the foregoing, plaintiff's renewed motion filed April 6, 1992 for summary judgment is GRANTED with respect to counterclaim Counts II, III and IV and is otherwise DENIED. Entry of judgment for plaintiff with respect to these three counterclaim counts shall be withheld pend-

ing resolution of all other outstanding issues.

The parties shall file a joint status report not later than Monday, January 25, 1993, advising of (1) the most convenient location for trial, (2) the time which will be required for trial and (3) any other matters which the parties deem appropriate.

It is contemplated that precise dates for pre-trial conference and trial and for submission of memoranda of contentions and other items described in paragraphs 11 through 15 of Appendix G, RCFC will be selected during an unrecorded telephone conference with counsel to be initiated by the court upon receipt of the joint status report designated in the preceding paragraph.