**EVERMAN NATIONAL BANK**

v.

**The UNITED STATES.**

**No. 494–81C.**

United States Claims Court.

April 10, 1984.

William E. Rollow, Washington, D.C., for plaintiff; Thomas F. Fitzgerald and White-ford, Hart, Carmody & Wilson, P.C., Washington, D.C., of counsel.

Steven J. Riegel, Washington, D.C., with whom were Asst. Attys. Gen. J. Paul McGrath, David M. Cohen, and Sandra P. Spooner, Washington, D.C., for defendant.

---

### MEMORANDUM OF DECISION

WHITE, Senior Judge.

The plaintiff, Everman National Bank (the Bank), of Fort Worth, Texas, seeks to recover in this action under a Contract of Guarantee which the Farmers Home Administration (the FmHA) of the Department of Agriculture issued to the Bank on January 9, 1976, in connection with an Emergency Livestock Loan of $160,000 made by the Bank to Truett C. House (Mr. House).

The defendant contends that the Bank is precluded from recovering because of a paragraph in the Contract of Guarantee stating in part as follows:

> This contract shall constitute an obligation supported by the full faith and credit of the United States and is incontestable *except for fraud or misrepresentation* of which Lender had actual knowledge at the time it became such Lender * * *. In addition, this contract will be unenforceable by the Lender to the extent that any loss is occasioned by * * * *negligent servicing* * * *. [Emphasis supplied.]

The Contract of Guarantee was issued by the FmHA in accordance with the authority granted by the Emergency Livestock Credit Act of 1974 (Pub.L. 93–357, 88 Stat. 391) (the Act). The Act, *as amended by* Public Law 94–35 (89 Stat. 213), authorized the Secretary of Agriculture to issue 90 percent loan guarantees through the FmHA to lending institutions in connection with loans made to livestock and poultry producers suffering losses due to adverse conditions.

During the 1971–75 period, Mr. House was a dairyman operating a dairy in the Fort Worth milkshed. He obtained from the Bank several loans with which to finance his dairy operations; and, as of October 1975, he was indebted to the Bank in connection with a $145,000 loan which he had obtained in October 1974.

*Alleged Misrepresentation*

The defendant contends (*inter alia*) that the Contract of Guarantee issued by the FmHA to the Bank on January 9, 1976, is void because of a misrepresentation in the Request for Contract of Guarantee which the Bank submitted to the FmHA in order to obtain the contract.

In October 1975, Mr. House asked the Bank to make a new loan to him in the amount of $160,000 for the purpose of retiring the existing debt on the $145,000 loan, and so that he would have available some funds with which to buy feed for his dairy cattle. On or about October 24, 1975, the Bank submitted to the FmHA a Request for Contract of Guarantee in connection with the $160,000 loan desired by Mr. House.

The Bank's request stated (among other things) that Mr. House's planned milk production from 277 dairy cows would be 3,490,200 pounds of milk per year, for a value of $349,020. This price was obviously calculated on the basis of $10 per 100 pounds of milk, which was approximately the price that was then being received by Texas dairy farmers for Grade A milk sold for direct human consumption. Consequently, the portion of the Request for Contract of Guarantee relating to milk production was a representation by the Bank that the milk from Mr. House's dairy was —and, during the period of the loan, would be—Grade A milk sold for direct human consumption.

The FmHA approved the application for a 90 percent loan guarantee on the $160,-

000 loan by the Bank to Mr. House; and a Contract of Guarantee was issued by the FmHA to the Bank on January 9, 1976.

After receiving the Contract of Guarantee from the FmHA, the Bank made the $160,000 loan to Mr. House. The proceeds of the loan were used for the purposes stated by Mr. House in his application.

When the Bank submitted the Request for Contract of Guarantee to the FmHA on or about October 24, 1975, Mr. House held a Grade A permit issued by the City of Fort Worth. However, a sample of milk taken by a city inspector from Mr. House's dairy about the middle of October 1975 had revealed a bacteria count that exceeded the standard prescribed by Fort Worth for bacteria. Because of this, the inspector assigned to the House dairy returned to the dairy in the latter part of October 1975 and took a second sample of milk. An analysis of the second sample revealed that the milk was still in violation of the standard prescribed by Fort Worth for the bacteria count. As a result of these developments, the City of Fort Worth suspended Mr. House's Grade A permit on October 30, 1975.

Fort Worth health officials notified the distributing dairy, which had been purchasing Mr. House's milk for Grade A use, that Mr. House had lost his Grade A permit and, consequently, that milk from Mr. House's dairy could not be used for Grade A purposes.

Soon after the suspension of Mr. House's Grade A permit, Mr. House asked Fort Worth health officials to reinstate his Grade A permit. Pursuant to this request, the inspector assigned to Mr. House's dairy returned to the dairy and informed Mr. House that, in order to regain his Grade A permit, it would be necessary for him to sign a document stating where he had disposed of the milk while the dairy was off grade. If Mr. House had furnished this information, and if it had shown that the milk had not been disposed of for direct human consumption during the period of suspension, the suspension would have been lifted without further delay and Mr. House could have resumed the sale of milk under his Grade A permit. However, Mr. House refused to tell the inspector, or to sign a document stating, what had happened to the milk from his dairy during the period of suspension.

In view of Mr. House's refusal to furnish to the inspector information regarding the disposition of his milk during the period of suspension, the City of Fort Worth notified Mr. House that on November 17, 1975, there would be a hearing at which he would be required to furnish information regarding the disposition of his milk during the period of suspension. The notice further stated that if he failed to furnish such information, his Grade A permit would be revoked.

The hearing was held on November 17, 1975. At the hearing, city officials asked Mr. House to tell them, and to sign a document stating, what had happened to his milk while his dairy was off grade. Mr. House refused to furnish the information demanded by city officials. Because of this, the City of Fort Worth revoked Mr. House's Grade A permit on November 17, 1975.

Although Mr. House continued to operate his dairy in the Fort Worth milkshed until April 1976, the milk could not be sold for direct human consumption; and Mr. House's financial situation continued to deteriorate.

In April 1976, Mr. House moved his dairy from the Fort Worth milkshed to the Waco, Texas, milkshed. Mr. House had a son who was operating a dairy in the Waco milkshed under a Grade A permit; and it was Mr. House's expectation that he would be able to sell his milk in the Waco milkshed for direct human consumption under his son's Grade A permit.

However, Mr. House's dairy operation in the Waco milkshed was never successful; and on August 31, 1976, Mr. House went into bankruptcy.

The sale of Mr. House's assets yielded $48,004.28 to the Bank (net after the payment of certain expenses), for application

on the much larger amount then owing by Mr. House to the Bank on the $160,000 loan.

The plaintiff's claim in the present action (as modified by the plaintiff after the complaint was filed) is to recoup, under the Contract of Guarantee, the major portion ($100,326.87, plus interest) of the loss which it sustained on the $160,000 loan to Mr. House.

The defendant asserts, as one of its defenses, that the Contract of Guarantee is void because of the alleged misrepresentation, in the Bank's Request for Contract of Guarantee, relative to the sale of Mr. House's milk as Grade A milk for direct human consumption.

It has been mentioned previously that Mr. House's milk was being legally sold as Grade A milk at the time when the Bank submitted its Request for Contract of Guarantee to the FmHA on or about October 24, 1975, but that Mr. House's Grade A permit was revoked by the City of Fort Worth on November 17, 1975, some 8 weeks before the Contract of Guarantee was issued by the FmHA to the Bank.

Sometime in December 1975, the Bank learned that Mr. House's Grade A permit had been revoked by the City of Fort Worth, that Mr. House's dairy was permanently off grade in the Fort Worth milkshed, and that the milk from the dairy could no longer be sold in that milkshed at Grade A prices for direct human consumption. However, the Bank did not disclose to the FmHA, at any time before the issuance of the Contract of Guarantee on January 9, 1976, that Mr. House's Grade A permit had been revoked.

An important question in the present case, therefore, is whether the Bank was under a legal duty to inform the FmHA, before the Contract of Guarantee was issued by the FmHA on January 9, 1976, that Mr. House's Grade A permit had been revoked.

The representation that Mr. House's milk qualified as Grade A milk was of great significance in connection with the Bank's request that the FmHA give it a 90 percent guarantee on the proposed $160,000 loan to Mr. House. Evidence in the record makes it plain that the ability to sell milk as Grade A milk for direct human consumption is essential to the financial survival of a dairy. If milk does not qualify as Grade A milk, it can be sold only for manufacturing purposes, such as making ice cream; and the price received by the dairyman for such milk is only about one-half the price paid for Grade A milk. A dairyman cannot survive financially for any lengthy period on the sale of so-called off-grade milk for manufacturing purposes.

The FmHA was unaware, at the time when the Contract of Guarantee was issued, that Mr. House's dairy was off grade and that his milk could not be sold at Grade A prices for direct human consumption, as indicated in the Bank's Request for Contract of Guarantee. If the FmHA had been aware that Mr. House no longer had a valid Grade A permit, the FmHA would not have guaranteed the $160,000 loan.

With respect to the question of whether the Bank was under a legal duty to inform the FmHA regarding the revocation of Mr. House's Grade A permit, section 551 of the RESTATEMENT (SECOND) OF TORTS (1977)—which was cited with approval by the Supreme Court in *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980)—is persuasive. That section provides in part as follows:

¶ 551. Liability for Nondisclosure

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

\*      \*      \*      \*      \*      \*

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so * * *.

A comment in the Restatement on clause (c) of paragraph (2) states that "[o]ne who, having made a representation which when made was true or believed to be so, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is morally and legally in the same position as if he knew that his statement was false when made."

It is concluded, therefore, that the Bank, when it learned that Mr. House's Grade A permit had been revoked, was under a legal duty to disclose this information promptly to the FmHA; and that the Bank's failure to discharge this legal obligation converted the representation in the Bank's Request for Contract of Guarantee concerning the Grade A quality of Mr. House's milk into a misleading statement known by the Bank to be untrue as of the time when the Contract of Guarantee was issued.

As this was a "misrepresentation of which Lender [the Bank] had actual knowledge at the time it became such Lender," and as the misrepresentation related to a material fact, it precludes the Bank from recovering under the Contract of Guarantee.

### Servicing of the Loan

The defendant also defends the present action on the ground that the Contract of Guarantee is unenforceable because the Bank allegedly was negligent in the servicing of the loan.

In this connection, the Contract of Guarantee stated in part that "this contract will be unenforceable by the Lender to the extent that any loss is occasioned by * * * negligent servicing."

On this point, the defendant relies upon the failure of the Bank to see to it that certain conditions, upon the basis of which the Contract of Guarantee was issued,

were fulfilled, and upon the failure of the Bank to visit Mr. House's dairy at any time between his removal from the Fort Worth milkshed in April 1976 and his bankruptcy at the end of August 1976, in order to ascertain the financial condition of the operation, and whether the collateral for the $160,000 loan was being preserved or dissipated. (The evidence shows that Mr. House's financial condition was extremely poor, and that the collateral for the $160,000 loan was largely dissipated sometime after Mr. House's removal from the Fort Worth milkshed.)

The conclusion reached in the preceding part of the decision, however, makes it unnecessary to consider the defendant's contentions relative to the servicing of the loan.

### CONCLUSION OF LAW

Upon the foregoing memorandum of decision and the facts as found by the court, including the conclusional findings stated in the memorandum of decision, the court concludes as a matter of law that the plaintiff is not entitled to recover.

The complaint will therefore be dismissed.

IT IS SO ORDERED.

### FINDINGS OF FACT

1. The plaintiff, Everman National Bank (the Bank), is a nationally chartered bank located in Fort Worth, Texas. Its president, at all times pertinent to this litigation, was Tommie J. Owen (Mr. Owen).

2. (a) Truett C. House (Mr. House) was a dairyman, to whom the Bank made several loans during the 1970–76 period. Mr. House first approached the Bank for a loan in about 1970. At that time, he was milking for a large dairy, and he was also raising some heifer calves on the side. He approached the Bank for a loan with which to buy some calves, and the loan was made. Mr. House raised the heifers until they became cows, and he then went into the dairy business for himself. At that time, the Bank made another loan to Mr. House

in order to finance the purchase of some additional dairy cows.

(b) Mr. House began operating his own dairy in about 1971. From that time until April 1976, Mr. House operated his dairy in the Fort Worth milkshed, first near Burleson, Texas, and, later, southwest of Crowley, Texas. The House dairy near Crowley was located about 10 miles southwest of the Bank, in a direct line.

3. During the early years of his dairy operations in the Fort Worth milkshed, Mr. House was a good dairyman and his dairy cows were large animals of good quality that yielded from about 45 to 52 pounds of milk per day per cow, which was a good average. The cows were purebred Holsteins and Brown Swiss, except that in 1974, at least, he had a few crossbred, half-and-half Holstein-Brown Swiss cows.

4. Before September 1974, the Bank made various loans to Mr. House in connection with his dairy operations. Mr. House customarily repaid those loans, and kept the Bank informed about his situation. Mr. Owen knew Mr. House, and considered him to be honest and of good character.

5. Emergency Livestock Loan guarantees were authorized by the Emergency Livestock Credit Act of 1974 (Pub.L. 93–357), enacted on July 25, 1974. This statute authorized the Secretary of Agriculture to issue 80 percent loan guarantees through the Farmers Home Administration (the FmHA) of the Department of Agriculture for livestock and poultry producers suffering losses due to adverse economic conditions.

6. (a) Times were hard for Mr. House in 1974. It was an extremely dry year; the cost of hay and feed increased because of the shortage of local forage; and, as a result, the cost of operations for Mr. House (and other dairymen in the Fort Worth milkshed) was increased.

(b) By about September 1974, Mr. House's situation reached the point where the Bank was on the verge of requiring Mr. House to liquidate his herd and pay the Bank the amount of the then-outstanding loan. Mr. Owen was of the belief that the liquidation of Mr. House's dairy herd would be more than sufficient to enable Mr. House to pay his debts. Mr. House, however, felt that he was too young to retire, and he wished to continue in the dairy business.

7. (a) In the early part of September 1974, Mr. House went to see Mr. Owen about a new loan in the amount of $145,-000, and informed Mr. Owen about the possibility of obtaining an 80 percent loan guarantee from the FmHA in connection with the Emergency Livestock Loan program. Mr. House informed Mr. Owen that he (Mr. House) would have an average of 170 dairy cows in the milking barn at all times, and that the cows would average 45 pounds of milk a day. Mr. Owen believed that the milk would be sold for direct human consumption as Grade A milk, at a price of about $10 per 100 pounds. On this basis, Mr. Owen indicated a willingness for the Bank to make the $145,000 loan if an 80 percent loan guarantee could be obtained from the FmHA.

(b) Mr. Owen got in touch with Edwin Allen (Mr. Allen), FmHA County Supervisor, relative to the procedure that should be followed in making an application for an 80 percent loan guarantee; and Mr. Allen sent the necessary forms to Mr. Owen.

(c) Mr. Owen visited Mr. House's dairy and personally inspected the cattle (210 dairy cows and heifers and 6 bulls) and milking equipment which Mr. House proposed to offer as collateral for the $145,000 loan. Mr. Owen verified the existence of the property and appraised it as having a total value of $150,100.

(d) Mr. House and Mr. Owen prepared and signed the papers required by the FmHA in connection with an Emergency Livestock Loan, consisting of an Application for Guaranteed Loan by Mr. House, Certificates of Lender and Loan Applicant by the Bank and Mr. House, and a Request for Contract of Guarantee by the Bank. These papers were then submitted to Mr. Allen.

(e) On October 2, 1974, Mr. Allen visited the House dairy farm and obtained from Mr. House a list of the cattle and other items of property that were to constitute the collateral for the $145,000 loan desired by Mr. House. Mr. Allen did not appraise the value of the collateral. Subsequently, the proposal was approved by the FmHA County Committee and by Mr. Allen, and it was then submitted to the FmHA District Director for final approval. It was approved by the District Director; and a Contract of Guarantee was issued to the Bank by the FmHA on October 22, 1974.

(f) The Bank then made the $145,000 loan in the due course of business. It received from Mr. House a properly executed note, a Security Agreement, and a Financial Statement.

(g) In connection with the $145,000 loan, the Bank was required to perfect its security interest in the collateral; and it did so by filing its lien instruments with the Secretary of State for the State of Texas.

(h) Without the guarantee, the Bank would not have made the $145,000 loan to Mr. House, but, instead, would have foreclosed on Mr. House's then-existing indebtedness to the Bank.

(i) After receiving the guarantee from the FmHA, the Bank disbursed the $145,000 loan. The disbursement was made in reliance on the guarantee and on the collateral.

8. The $145,000 loan mentioned in finding 7 was closed on October 22, 1974. Thereafter, the condition of Mr. House's dairy operation deteriorated, and he was unable to make payments on the loan in a timely manner. However, Mr. House stayed in touch with Mr. Owen. The latter was of the opinion, throughout the time when the $145,000 loan was outstanding, that the value of the collateral for the loan exceeded the amount of the debt.

9. After the $145,000 loan was disbursed, Mr. Owen visited the House dairy farm occasionally, but not on a regular basis. Mr. House's dairy farm was directly in line between Mr. Owen's home and a farm which he had offered for sale; and Mr. Owen would go by the House dairy quite often. Mr. Owen would stop at the House dairy farm at least once a month, and not more often than once every 2 weeks. On some of those occasions, Mr. House was present, and at other times he was not there. When Mr. Owen stopped at the House dairy, he would look at the dairy herd.

10. The Emergency Livestock Loan program was amended as a result of the enactment of Public Law 94–35 on June 16, 1975. Among other changes, this increased the maximum guarantee from 80 percent to 90 percent.

11. Mr. House continued to operate his dairy in the vicinity of Crowley after receiving the $145,000 loan, but his financial condition continued to deteriorate.

12. In October 1975, Mr. House requested the Bank to retire the then-existing loan and make a new loan to him in the amount of $160,000 for the purpose of (a) obtaining cash to pay for feed for his dairy cattle, and (b) retiring the existing debt on the $145,000 loan mentioned in previous findings. Mr. House represented to the Bank that he was qualified for, and could obtain, a 90 percent loan guarantee from the FmHA, upon which the Bank could base the new loan.

13. (a) In October 1975, Mr. House submitted to the Bank a new Application for Guaranteed Loan in the amount of $160,000. Mr. House's cattle and milking equipment were to constitute the collateral for the loan.

(b)(1) In connection with the new loan application, Mr. Owen personally inspected Mr. House's cattle and equipment, and appraised the value of the property. This appraisal was contained in a new Request for Contract of Guarantee, which was submitted by the Bank to the FmHA on October 24, 1975.

(2) The portion of the appraisal referring to cattle stated as follows:

277 dairy cattle—$138,500

75 beef cattle—$14,000

6 bulls—$3,600

(3) The total head of cattle counted in this appraisal was 358, for a total value of $156,100.

(4) Mr. House's milking equipment, appraised at $6,500, was also to serve as collateral for the $160,000 loan.

(5) Subsequent to, but shortly after, the loan was applied for, a director of the bank, Ray Thomas, also verified the existence of the collateral and the number of cattle offered as security.

(6) The dairy cattle owned by Mr. House and offered as collateral for the $160,000 loan included 207 Holstein milk cows and 70 Brown Swiss dairy cows. They were large animals of good quality, and they were in good condition.

(7) Although Mr. House had more collateral available, with a greater value than that originally pledged to secure the $145,000 loan, the bank did not regard Mr. House as independently able to borrow the $160,000 requested by him, and the Bank agreed to make the loan primarily upon the basis of being able to obtain a 90 percent FmHA loan guarantee.

(c)(1) On October 24, 1975, the Bank, by Mr. Owen, signed a Request for Contract of Guarantee in connection with the proposed $160,000 loan. Paragraph 18(b)(1) of that document stated that Mr. House's planned milk production from 277 cows would be 3,490,200 pounds of milk per year, for a value of $349,020. This price was calculated on the basis of approximately $10 per 100 pounds of milk.

(2) Published figures for the average price of wholesale milk sales by Texas farmers, compiled by the Texas Livestock Reporting Service, are as follows:

1975—$9.45 per 100 pounds

1976—$10.60 per 100 pounds

These prices were for Grade A milk, sold for direct human consumption.

(d) (1) The Bank thereafter submitted to the FmHA the new Request for Contract of Guarantee in the increased principal amount of $160,000 (rather than the 80 percent guarantee for the then-existing 1974 loan).

(2) The documents executed and submitted to the FmHA in connection with the new 90 percent loan included an Application for Guaranteed Loan by Mr. House, a Request for Contract of Guarantee by the Bank, the County Committee Certification, and an Emergency Livestock Loan Analysis.

(3) The statements contained in the Application for Guaranteed Loan (FmHA Form 449–6) and in the Request for Contract of Guarantee (FmHA Form 449–25) were true and correct when made.

(e) (1) The FmHA approved the application for a 90 percent loan guarantee in connection with the proposed $160,000 loan by the Bank to Mr. House; and a Contract of Guarantee was issued to the Bank by the FmHA on January 9, 1976.

(2) The proceeds from the $160,000 lien were to be used in part to retire the then-existing 1974 80 percent guaranteed loan in the amount of $145,000, and also to cover some advances which the Bank had made to Mr. House in order that he might purchase some additional cattle and buy some feed.

(3) The Contract of Guarantee was dated January 9, 1976, and stated in part that: "the lender [the Bank] agrees * * * to service the loan as required by 7 C.F.R. § 1845."

(4) The Contract of Guarantee dated January 9, 1976, also contained the following paragraph:

This contract shall constitute an obligation supported by the full faith and credit of the United States and is incontestable except for fraud or misrepresentation of which Lender had actual knowledge at the time it became such Lender, or which Lender participates in, or condones. In addition, this contract will be unenforceable by the Lender to the extent that any

loss is occasioned by the violation of usury laws, use of loan funds for unauthorized loan purposes, negligent servicing, or failure to obtain the required security.

(5) The Contract of Guarantee dated January 9, 1976, also stated three special conditions to the loan guarantee, as follows:

1. Sell all beef cattle within a reasonable period of time and apply proceeds on note in addition to regular payment.

2. Proceeds from all cattle sold to be applied on note or used to purchase replacements.

3. Everman National Bank to take an assignment on milk sales in the amount not less than $3000.00 per month. This assignment will not be released and all of it will be applied to the note being guaranteed by the Farmers Home Administration.

This was signed by House and Owen.

14. (a) After receiving the Contract of Guarantee from the FmHA, guaranteeing 90 percent of the loan in the amount of $160,000 to Mr. House, the Bank made the loan to Mr. House on January 9, 1976, in the normal course of business. The Bank received back from Mr. House a duly executed installment note, a Security Agreement, and a Financing Statement.

(b) The proceeds of the loan were disbursed for the purposes mentioned in finding 13(e)(2).

(c) The Bank perfected its security interest in the collateral for the $160,000 loan by filing the lien instruments with the Secretary of State for the State of Texas, and also with the county.

15. The loan in the amount of $160,000, guaranteed to the extent of 90 percent by the FmHA under the Emergency Livestock Loan program, is the subject of the present action.

16. (a) Dairy farmers are regularly inspected by local health authorities in order to determine if their milk is suitable for sale as Grade A milk for direct human consumption. Possession of a Grade A milk license is referred to as being "on grade."

(b) If a dairy farmer fails to comply with the sanitation, bacteria count, or other standards for Grade A milk, his Grade A permit is suspended or revoked. During a period of suspension or after a revocation, milk from the dairy is referred to as being "off-grade" or "Grade B" milk.

(c) Grade B or off-grade milk cannot be sold for direct human consumption, but it can be sold for manufacturing purposes, such as making ice cream. The price received by a dairyman for off-grade milk is approximately half the price that would be received for Grade A milk. A dairy cannot survive financially for any lengthy period on sales of milk for manufacturing purposes.

17. As a dairyman operating in the Fort Worth milkshed, Mr. House's dairy was inspected regularly by the Milk Inspection Division of the Fort Worth Public Health Department, from the beginning of his operations until November 1975. It was customary for an inspector in that milkshed to visit each dairy at least twice a month. The first visit was for the purpose of making a routine inspection, and the second visit was for the purpose of taking a milk sample to be analyzed.

18. (a) The inspector assigned to Mr. House's dairy took a milk sample from the dairy in about the middle of October of 1975; and the analysis of that sample revealed that the milk had a bacteria count which exceeded the standard prescribed by Fort Worth for the bacteria test. Because of this, the inspector returned to the House dairy in the latter part of October 1975 and took a second sample of the milk from that dairy. An analysis of the second sample revealed that the milk was still in violation of the standard prescribed by Fort Worth for the bacteria count.

(b) As a result of the developments referred to in paragraph (a) of this finding, the City of Fort Worth suspended Mr. House's Grade A permit on October 30, 1975. The notice of suspension was given to Mr. House over the telephone; and Fort

Worth health officials also notified the distributing dairy, which had been purchasing Mr. House's milk for Grade A use, that Mr. House had lost his Grade A permit and, consequently, that milk from Mr. House's dairy could not be purchased for Grade A use.

19. (a) Soon after the suspension of Mr. House's Grade A permit, Mr. House asked Fort Worth health officials to reinstate his Grade A permit. In connection with this request, the inspector assigned to Mr. House's dairy returned to the dairy and informed Mr. House that, in order to regain his Grade A permit, it would be necessary for him to sign a document stating where he had disposed of the milk while the dairy was off grade. The evidence indicates, and it is found, that if Mr. House had furnished this information, and if it had shown that the milk from Mr. House's dairy during the period of suspension had not been disposed of for direct human consumption, Mr. House's Grade A permit would have been reinstated without further delay. However, Mr. House refused to tell, or to sign a document stating, what had happened to the milk from his dairy during the period of suspension.

(b) In view of Mr. House's refusal to furnish to the inspector information regarding the disposition of the milk from his dairy during the period of suspension, the City of Fort Worth served a notice on Mr. House regarding a hearing on November 17, 1975, at which he would be required to furnish information regarding the disposition of milk from his dairy during the period of suspension; and the notice stated that if he failed to furnish such information, his Grade A permit would be revoked.

(c) The hearing was held on November 17, 1975. At the hearing, city officials asked Mr. House to tell them, and to sign a document stating, what had happened to his milk while his dairy was off grade. Mr. House refused to furnish the information demanded by city officials. Because of this, the City of Fort Worth revoked Mr. House's Grade A permit on November 17, 1975. Although Mr. House continued to operate his dairy in the Fort Worth milkshed until April 1976, the milk could not be sold for direct human consumption, and Mr. House's financial situation continued to deteriorate.

20. (a) Sometime in December 1975, Mr. Owen learned that the Grade A permit for Mr. House's dairy had been revoked by the City of Fort Worth, that Mr. House's dairy was permanently off grade in the Fort Worth milkshed, and that the milk from the dairy could no longer be sold in that milkshed at Grade A prices for direct human consumption.

(b) The Bank did not disclose to the FmHA, at any time before the Contract of Guarantee was issued on the $160,000 loan, that the Grade A permit for Mr. House's dairy had been revoked.

(c) The FmHA was unaware, at the time when the Contract of Guarantee was issued on the $160,000 loan, that Mr. House's dairy was off grade and that milk from the dairy could not be sold at Grade A prices for direct human consumption, as indicated in the Request for Contract of Guarantee submitted to the FmHA by the Bank in connection with the application for a 90 percent guarantee on the $160,000 loan. If the FmHA had been aware that Mr. House no longer had a valid Grade A permit, the FmHA would not have guaranteed the $160,000 loan.

21. During the period beginning with the disbursement of the $160,000 loan on or about January 9, 1976, to the spring of 1976, Mr. House's dairy operation was conducted at Crowley. Throughout that period, Mr. Owen would informally visit Mr. House's dairy every 2 weeks or so. During these casual visits, Mr. Owen observed the cattle constituting collateral for the loan to be present and in good condition; and the dairy operation appeared to be well run.

22. (a) In the early part of April 1976, Mr. House went to see Mr. Owen at the Bank. Mr. House stated that he wanted to move his dairy from the Fort Worth milkshed to Hamilton, Texas, which is about 115 miles southwest of Fort Worth and in the Waco, Texas, milkshed. Mr.

House further stated that he had a son who was operating a dairy in the Waco milkshed; that the son held a Grade A permit; and that Mr. House, if located in the Waco milkshed, could sell the milk from his dairy for direct human consumption under his son's Grade A permit.

(b) Mr. Owen orally informed Mr. Allen over the telephone of Mr. House's desire to move his dairy to Hamilton, Texas. Mr. Allen indicated that the FmHA had no objection to the proposed move.

(c) Mr. House moved his dairy to Hamilton, Texas, near the end of April 1976. Thereafter, for a time, Mr. House would telephone Mr. Owen at least once every 2 weeks and give Mr. Owen a progress report with respect to his operations.

23. Moving a dairy herd for a substantial distance involves a risk of injury to the dairy cows, principally injuries to their legs and udders. Even if dairy cows are not injured during the course of such a move, the move ordinarily has an adverse effect on their milk production and, therefore, on the dairyman's income from the milk production.

24. On a date that is not clearly shown by the record, Mr. House again moved his dairy, this time from Hamilton, Texas, to the vicinity of Indian Gap, Texas, which is approximately 130 miles southwest of Fort Worth. Indian Gap is also located within the Waco milkshed.

25. (a) During the period beginning with the removal of Mr. House's dairy from the Fort Worth milkshed in the latter part of April 1976 and extending until August 31, 1976, no representative of the Bank ever visited Mr. House's dairy farm on any occasion, in order to ascertain how the operation was faring financially, and whether the collateral was being preserved or dissipated.

(b) Mr. House did not have a telephone at either Hamilton or Indian Gap; and the only contact that the Bank had with Mr. House was when Mr. House would use a telephone somewhere else and call the Bank.

26. (a) On or about June 10, 1976, Mr. House called Mr. Owen on the telephone and informed Mr. Owen that he was thinking about selling his dairy herd.

(b) On June 11, 1976, Mr. Owen wrote a letter to Mr. Allen, as follows:

Mr. Truett House called at my office yesterday. During this visit he informed me that he intended to sell his dairy herd and equipment and quit the dairy business.

One reason he used was his health. As your file will reflect, your organization guarantees 90% of a loan in the original amount of $160,000 to the Everman National Bank of Fort Worth. This loan is secured by Mr. House's cattle and equipment.

Mr. House's note is now past due since June 1, 1976. Mr. House indicated that he would not be able to make further payments except from the sale of the collateral. The situation does not look promising, but the entire sale of the collateral will retire the debt.

I will keep you informed as the situation progresses. I would appreciate any comments or advice that you might be able to give me in order that this situation might be handled in a manner entirely satisfactory to your organization.

(c) Mr. Allen did not respond to the letter dated June 11, 1976.

27. (a) On or about July 23, 1976, Mr. House again called Mr. Owen on the telephone and informed Mr. Owen that he was operating his dairy at Indian Gap, which is located between Hamilton and Stephenville, Texas. Mr. House reported that the move to Indian Gap had cost him about $12,000 and also had hurt his milk production. Mr. House went on to say, however, that things looked promising, and that if the Bank would permit him to skip a couple of payments on the $160,000 loan, he thought he could have things worked out by September 1.

(b) On July 26, 1976, Mr. Owen wrote another letter to Mr. Allen, as follows:

I had a conference with Mr. Truett House last Friday. He is milking his cattle again on a leased dairy farm near Stephenville. He seems to be confident that he can pay the above referenced debt. I requested two payments to be made on the note at this time, and as usual, he could not make them. He did state that within sixty days he could resume making payments on schedule. As you are aware, Mr. House is now two payments in the arrear. It is my judgment that the Farm Home Administration and the Everman National Bank would be no worse off, and perhaps better off, if the two past due payments plus the next two payments were added to the end of this note. In other words, renew and extend this note four months. At the end of this period, ending September 1, 1976, if Mr. House is unable to resume payments, I will immediately cause the collateral to be liquidated and proceeds thereof applied to this debt. If this proposed arrangement meets with your approval, I would appreciate it very much if you would advise me as to how this renewal and extension could be accomplished.

(c) The FmHA did not respond to this letter.

28. On August 31, 1976, Mr. House and his wife filed a Debtor's Petition in Bankruptcy in the United States District Court for the Northern District of Texas, Fort Worth Division.

29. On September 1, 1976, Tim Truman was appointed receiver in the House bankruptcy case by the Bankruptcy Court. He was later appointed trustee of the bankrupt estate of Mr. and Mrs. House.

30. (a) On September 2, 1976, Tim Truman drove to Indian Gap, met with Mr. and Mrs. House, and took possession of approximately 210 cows and bulls, as well as other property. The cattle were standing in a dry lot, which had no grass cover. All the cattle were thin, weak, and in very poor condition, due to lack of proper diet.

(b) The Bank's appraisal of Mr. House's property on October 15, 1975, had counted 358 head of cattle (277 dairy cattle, 75 beef cattle and 6 bulls). By September 2, 1976, all that remained for the receiver to take over were approximately 210 head of cattle.

(c) Also, the cows among the 210 head of cattle in the lot at Indian Gap were small-frame cows, of various breeds and mixed breeds. They were not the big-frame Holstein and Brown Swiss cows which had been offered as collateral for the $160,000 guaranteed loan.

(d) The record does not disclose what happened to the dairy cows that were offered as collateral for the $160,000 loan. Mr. House was not called as a witness by either party.

31. On September 2, 1976, Tim Truman arranged with Mr. and Mrs. Harold Limmer, the owners of the farm which Mr. House was renting at Indian Gap, to feed all the cattle and milk the dairy cows.

32. On September 3, 1976, Tim Truman telephoned the Bank and advised Mr. Owen that Mr. and Mrs. House had filed for bankruptcy. Mr. Owen gave the name and telephone number of Mr. Allen to Tim Truman.

33. After learning of the bankruptcy filing, Mr. Owen promptly visited Mr. House's farm at Indian Gap, with two seasoned cattlemen. This was the first visit to Mr. House's dairy by a representative of the Bank after Mr. House left Crowley.

34. On September 11, 1976, 206 cows, 3 bulls, and 1 calf were moved, by agreement between Tim Truman and the Bank, to the Mansfield Dairy Cattle Auction.

35. On September 30, 1976, the Bankruptcy Court entered an order authorizing abandonment of the property.

36. On September 30, 1976, by direction of the Bank, the cattle formerly owned by Mr. House were sold at auction by the Mansfield Dairy Auction. The sales receipt indicates that 214 head of cattle were sold, for a net total paid to the Bank of $43,-394.65, after the deduction of certain ex-

penses. This was an average of $202.78 per head.

37. By order on or about November 12, 1976, the Bankruptcy Court determined that the Bank did not have a properly filed and perfected security interest in some of the milking equipment in the House estate. The milking equipment was appraised as collateral for $6,500. It was subsequently sold on December 30, 1976, for a price of $5,550, of which $4,609.63 was later paid to the Bank. The Bank's loss on the unfiled portion of this equipment was $1,890.37.

38. (a) On September 11, 1978, the Bank filed with the FmHA a Report of Loss (Form FmHA 449–20), claiming a loss of $126,244.81 on the $160,000 loan. Supplementary information was later supplied.

(b) After an investigation, the state office of the FmHA, at Temple, Texas, denied the Bank's claim on November 7, 1979.

(c) The Bank, by Mr. Owen, met with State Director W.H. Pieratt, who affirmed the original decision to deny the claim.

(d) By a letter to James E. Lee, Assistant Administrator, FmHA, Washington, D.C., on November 29, 1979, the Bank appealed the decision endorsed by W.H. Pieratt.

(e) By letter of March 14, 1980, Gordon Cavanaugh, Administrator, FmHA, determined that FmHA would not honor the Report of Loss.

39. This action followed.

40. (a) With respect to the condition of the Contract of Guarantee dated January 9, 1976, to the effect that Mr. House should "sell all beef cattle within a reasonable time and apply the proceeds on note in addition to regular payment," Mr. Owen encouraged Mr. House to sell his beef cattle. However, Mr. House did not do so, and Mr. Owen did not take any action in an attempt to compel Mr. House to comply with this condition.

(b) With respect to the condition in the Contract of Guarantee to the effect that "proceeds from all cattle sold to be applied on note or used to purchase replacements," the evidence is not clear regarding the ex-

tent to which cattle offered as collateral for the $160,000 loan were sold by Mr. House, or as to what happened to the proceeds from any such sales. Actually, the record does not show what happened to the Holstein and Brown Swiss dairy cows that constituted the greater part of the collateral for the $160,000 loan.

(c) With respect to the condition in the Contract of Guarantee to the effect that the Bank should "take an assignment on milk sales in an amount not less than $3,000.00 per month," and that the proceeds from such assignment should "be applied to the note being guaranteed by the Farmers Home Administration," the Bank did not at any time obtain an assignment of milk sales.