BENNETT, Circuit Judge.
Plaintiff, Everman National Bank (Everman), appeals the decision of the United States Claims Court, 5 Cl.Ct. 118 (1984), dismissing its petition to recover from the United States, pursuant to a contract of guarantee, the major portion of the loss sustained in connection with an emergency livestock loan made by Everman to Truett C. House. We affirm the dismissal.
BACKGROUND
In the early 1970s House began operating a dairy in the Fort Worth milkshed. In 1974 dairymen throughout the country began experiencing severe financial distress. Until this time House had been successful in his dairy operations and enjoyed a good credit record. In September 1974 House requested Everman to loan him $145,000 pursuant to the Emergency Livestock Credit Act of 1974 (Act), Pub.L. No. 93-357, 88 Stat. 391 (1974). The Act authorized the Secretary of Agriculture to enter into contracts guaranteeing loans made by legally organized lending agencies to individuals primarily and directly engaged in certain aspects of livestock production. The Act limited the amount of the guarantee to 80 percent of any loss sustained on the loan. On October 22, 1974, the Secretary of Agrh culture, acting through the Farmers Home Administration (FmHA), issued a contract of guarantee to Everman for the $145,000 loan to House. The primary purpose of the $145,000 loan was to retire an existing debt which House owed to Everman.
The financial condition of House’s dairy operation deteriorated and he was unable to make payments on the loan in a timely manner. In October 1975 House requested Everman to make a new loan of $160,000 pursuant to the Act, amended by Pub.L. No. 94-35, 89 Stat. 213 (1975). The 1975 amendment raised the guarantee limit to 90 percent of the principal and interest of the loan. Upon receiving the January 9, 1976 contract of guarantee from FmHA, Ever-man made the loan to House. House primarily used the proceeds of the loan to retire the existing obligation to Everman arising out of the earlier $145,000 loan. The deterioration of House’s dairy operation escalated and on August 31, 1976, House and his wife filed a petition in bankruptcy.
In the latter part of 1978, Everman filed with the FmHA a claim for its loss on the loan to House. On November 7, 1979, the *867 state office of FmHA denied Everman’s claim. Everman met with the State Director of the FmHA who affirmed the original decision to deny the claim. On November 29, 1979, Everman appealed to the national office of FmHA. On March 14,1980, the Administrator of FmHA determined not to honor Everman’s claim. On August 12, 1981, Everman filed its petition for $113,620.33 (plus interest, attorney fees, and costs) in damages in the United States Court of Claims. The United States contended that Everman had breached the contract of guarantee and was consequently precluded from recovering. The United States alleged that Everman (1) had misrepresented the value of House’s planned milk production and (2) had negligently serviced the loan.
The trial court found that prior to disbursing the proceeds of the loan on January 9,1976, Everman had actual knowledge that The City of Fort Worth had revoked House’s Grade A permit. The court considered the revocation to be a material fact which Everman was under a legal duty to disclose. The court held that Everman’s failure to disclose precluded it from recovering under the contract of guarantee. The court thus found it unnecessary to consider the United States’ contention that Everman was negligent in servicing the loan.
DISCUSSION
Local health authorities regularly inspect dairy operations to determine whether the milk is suitable for direct human consumption. Milk suitable for direct human consumption is referred to as “Grade A” milk. Possession of a Grade A milk permit is referred to as “on-grade.” Failure to comply with the requisite Grade A standards results in being “off-grade,” and loss of the Grade A permit. The loss of the Grade A permit may be either temporary (by suspension) or permanent (by revocation). A dairyman who loses his Grade A permit likely will be allowed to sell his milk for manufacturing purposes. Milk sold for manufacturing purposes is referred to as “Grade B” milk. The significance in possessing a Grade A permit as opposed to a Grade B permit is that a dairyman can sell Grade A milk for approximately twice the price of Grade B milk. Consequently, the loss of a Grade A permit is likely to be financially ruinous to one engaged primarily in the production of milk.
On October 24, 1975, Everman requested a contract of guarantee from FmHA in connection with the proposed loan of $160,-000 to House. In its request, Everman valued House’s planned milk production at $349,020. In valuing the planned milk production, Everman assumed that House would sell his milk for direct human consumption.[1] The valuation of House’s planned milk production was accurate at the time submitted. 5 Cl.Ct. at 125.
On October 15, 1975, a Fort Worth milk inspector collected a milk sample from House’s dairy. A laboratory analysis revealed that the milk sample exceeded the Grade A bacteria count permitted by Fort Worth. A second sample taken on October 28, 1975, likewise exceeded the allowable Grade A bacteria count. Consequently, on October 30, 1975, Fort Worth health authorities suspended House’s Grade A milk permit. In response to House’s request for reinstatement of his Grade A permit, an inspector informed House that he must sign a document evidencing that during the period of suspension he had not disposed of the milk from his dairy for direct human consumption. House refused to disclose what he had done with the milk. On November 11, 1975, the local authorities reinstated House’s Grade A permit pending a hearing. At the hearing on November 17, 1975, the health authorities gave House the option of either disclosing information concerning the disposition of milk from his dairy during the period of suspension or *868 having his Grade A permit revoked. House chose the latter and the health authorities revoked the permit at once. This is a matter of public record.
In supporting its dismissal of Everman’s claim, the trial court stated:
Sometime in December 1975, the Bank learned that Mr. House’s Grade A permit had been revoked by the City of Fort Worth, that Mr. House’s dairy was permanently off grade in the Fort Worth milkshed, and that the milk from the dairy could no longer be sold in that milkshed at Grade A prices for direct human consumption.
5 Cl.Ct. 121; see id. at 127. Everman contends that the trial court’s finding was clearly erroneous. We agree. Everman’s president, Tommie J. Owen, testified that it was not until about January 25, 1976, that he learned of the revocation of House’s Grade A permit. The United States did not present any evidence which contradicted Owen’s testimony. Because Everman did not have actual knowledge of the revocation until after it had disbursed the loan proceeds to House, it could not have misled FmHA with respect to the revocation of House’s permit. The portion of the trial court’s decision, which precludes Everman from recovering on the basis of its failure to disclose the revocation, is in error but is unnecessary to the same result under the facts of this case.
While Everman was not aware of the revocation until about January 25, 1976, it admits that in December 1975, prior to disbursing the loan proceeds, it became aware that the Grade A permit had been suspended. Owen testified that on an unspecified date in December 1975 he learned, in a conversation with the milk inspector’s immediate supervisor, Kenneth Seaman, that House was off-grade.[2] Although Owen assumed the off-grade status to be temporary, Seaman gave Owen no indication that the off-grade status would return to on-grade. To the contrary, Seaman indicated that House had refused to take the steps required to return to on-grade status and that House would remain off-grade until he complied. Yet, Everman failed to disclose these facts to FmHA prior to disbursing the loan proceeds to House.[3]
The contract of guarantee states in pertinent part:
This contract shall constitute an obligation supported by the full faith and credit of the United States and is incontestable except for fraud or misrepresentation of which Lender had actual knowledge at the time it became such Lender, or which Lender participates in, or condones. [Emphasis added.]
Thus, the issue is whether it was a misrepresentation for Everman to fail to disclose to FmHA the nature of House’s off-grade status as understood by Everman, namely, that House’s refusal to disclose the requisite information prevented him from selling grade A milk in the Fort Worth milkshed.[4]
Everman’s duty to exercise reasonable care to disclose is bottomed on two separate considerations. First, unlike an arm’s-length bargain, a contract of guarantee invites the peculiar confidence of a fiduciary relation. See generally W. Keeton, *869 D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on the Law of Torts § 106 (5th ed. 1984). A duty to disclose arises out of a fiduciary relation. Chiarella v. United States, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (quoting RESTATEMENT (SECOND) OF TORTS § 551(2)(a) (1976)). Second, a party is justified in relying on the factual representations made by another party to a guarantee transaction. A duty to disclose arises when the party subsequently acquires information that affects his previous representation. RESTATEMENT (SECOND) OF TORTS § 551(2)(c).
Everman’s duty to disclose is limited by the rule of materiality. The standard to be applied to the facts of this case is whether a prudent and reasonable banker would have.reason to know that FmHA would regard as important the fact that House’s refusal to disclose constituted a bar to his selling Grade A milk. See id. at § 538; cf. Security State Bank v. United States, 221 Ct.Cl. 942, 945 (1979) (the court construed the Act as requiring the lender to act as a “prudent and reasonable banker”). Unless this information was either irrelevant or trivial, Everman had a duty to disclose it to FmHA prior to consummating the transaction by disbursing the loan proceeds to House.
The valuation of House’s planned milk production, based on Grade A prices, was accurate at the time Everman requested the loan guarantee from FmHA on October 24, 1975. However, the significant adverse financial consequences of House’s subsequent decision to remain off-grade made Everman’s previous representation concerning the value of House’s planned milk sales untrue and misleading in that it overstated the value by approximately 100 percent. Although the valuation was a prediction, it at least implied that Everman knew of no facts that would make its fulfillment impossible. See James & Gray, Misrepresentation — Part II, 37 Md.L.Rev. 488, 502-04 (1978). FmHA had no knowledge of the facts available to Everman when the guarantee was made for the $160,000 bank loan on January 9, 1976. Everman had reason to know that House’s position on the suspension of his permit would be regarded as important by FmHA. Such knowledge obviously would have thwarted the guarantee because it was material to the soundness of the loan. It was no minor matter. Accordingly, the failure to disclose to FmHA the information acquired in December, prior to disbursing the loan proceeds to House, precludes Everman from recovering any part of its unrecovered losses on the loan under the contract of guarantee.
Everman contends that, even if we agree with the Claims Court that Everman made a material misrepresentation, FmHA was required to rescind the contract within a reasonable time of learning of it. This suggests that the contract was only voidable. The regulations dictate otherwise. An original lender’s material misrepresentation voids a contract of guarantee made by FmHA pursuant to the Emergency Livestock Credit Act. 7 C.F.R. § 1841.36(a) (1976).
We agree, therefore, with the result reached by the United States Claims Court on the merits. We further agree that it is thus unnecessary to consider the government’s contentions relative to negligent servicing of the loan by the bank.
AFFIRMED.

. Everman estimated House's planned milk production to be 3,490,200 pounds. By valuing the planned milk production at $349,020, Everman necessarily assumed the price of House's milk sales to be $10 per 100 pounds, which closely approximates the average price of 'wholesale Grade A milk sales by Texas farmers during 1975 and 1976. See 5 Cl.Ct. at 125.

. In response to a question about why he never inquired into the reason for House’s off-grade status, Owen replied that he "knew why." When asked what the reason was, Owen stated:
Because he wouldn’t disclose to the milk inspector what he had done with some grade B milk. Mr. Seaman himself told me that that was the reason he was off. He said, [”]The bacterial problem can be cured, but until that man tells us what he did with that grade B milk, I am not going to put him back on grade.[’’]

. Owen testified that after learning of House’s off-grade status, he told House to "make peace with the milk inspectors.” Yet, there is nothing in the record that indicates House led Owen to believe he would comply with Owen’s suggestion. Thus, any belief on the part of Owen that House would have a change of heart and disclose the requisite information was unjustified.

. A different problem might be encountered where a lender understood a dairyman to be temporarily off-grade merely because the bacteria count of his milk exceeded the allowable limit. That is not this case. Here, the lender knew that the dairyman had refused to take the action necessary to lift the suspension.